[No. D021840. Fourth Dist., Div. One. July 18, 1997.]

SHAWN WIMBERLY, Plaintiff and Appellant, v.
DERBY CYCLE CORPORATION, Defendant and Appellant.

COUNSEL

Hurst & Hurst, Debra L. Hurst and Kyle Van Dyke for Plaintiff and Appellant.

Hennelly & Grossfeld, John J. Hennelly, Susan J. Williams and James D. Demet for Defendant and Appellant.

## OPINION

**WORK, Acting P. J.**—When the fork assembly on Shawn Wimberly's mountain bike broke, he was thrown to the ground and grievously injured. In this strict product liability action, Derby Cycle Corporation (Derby), producer and distributor of the fork assembly, appeals a judgment and an order denying its motion for judgment notwithstanding the verdict (JNOV) following a jury verdict against it. Derby contends the trial court erred in refusing to apply Proposition 51 to require the jury to apportion "fault" among it, the product's manufacturer and others.[1] Such a comparison ostensibly would have absolved Derby from liability for Wimberly's noneconomic damages because the manufacturer defectively welded the fork assembly. Wimberly also appeals, claiming the court abused its discretion in denying him costs incurred to prove facts after Derby denied his requests for admissions (Code Civ. Proc.,[2] § 2033).

We conclude Proposition 51 is inapplicable; a strictly liable defendant may not reduce or eliminate its responsibility to plaintiff for damages caused by a defective product by shifting blame to others in the product's chain of distribution. We also conclude Wimberly is entitled to recover costs of proof. Accordingly, we affirm the trial court's judgment and order denying Derby's motion for JNOV, but reverse the order denying costs and remand for redetermination.

### FACTUAL AND PROCEDURAL BACKGROUND

Derby, which owned the "Nishiki" trade name, hired Richard Cunningham to design a mountain bike called the "Nishiki Alien." The bike's fork assembly consisted of a steerer tube welded to a set of forks, and Cunningham specified "non-rifled" tubes, as opposed to "rifled" tubes, because the latter were more susceptible to weakening in the welding process. Derby hired Taiwan An Len to manufacture the fork assemblies; it unilaterally substituted rifled tubes, assuring Derby they were of equal or better quality than those specified. While Cunningham was unhappy with the substitution,

---

[1]The Fair Responsibility Act of 1986 (Civ. Code, § 1431 et seq.), known popularly as Proposition 51, eliminated joint and several liability for noneconomic damages in actions based on "comparative fault."

[2]All statutory references are to the Code of Civil Procedure unless otherwise specified.

he told Derby the rifled tubes raised no safety concern if they were properly welded to the forks. Without any testing, Derby distributed Nishiki Alien bicycles fitted with the fork assemblies, and fork assemblies for separate purchase, to bicycle shops.

Wimberly bought one of the fork assemblies at La Mesa Cyclery and installed it on his mountain bike. Several months later, Wimberly sustained serious facial and dental injuries when his bike crashed after the fork assembly broke. He sued Derby, Taiwan An Len and La Mesa Cyclery, alleging products liability causes of action including negligence, breach of warranty and strict liability; Wimberly did not name Cunningham. Wimberly received a $135,000 settlement from Taiwan An Len, which Derby stipulated was a good faith settlement. Wimberly dismissed all defendants but Derby before trial.

At trial, Wimberly's expert metallurgist, Gary Fowler, Ph.D., testified the steerer tube on the fork assembly was cracked during the welding process. There was also no "post-weld heat treatment," and as a result the tube was "brittle and offer[ed] very poor crack arrest qualities." Dr. Fowler believed those problems and the use of rifled tubing, which is thinner than the specified nonrifled tubing, were substantial factors in the fork assembly's ultimate failure. Derby called no expert witness.

The case went to the jury only on Wimberly's strict product liability claim. Before deliberations began, Derby argued Proposition 51 required the jury to determine the comparative fault of it, Cunningham, Taiwan An Len and La Mesa Cyclery. The court determined Proposition 51 was inapplicable, reasoning "[Taiwan] An Len manufactured the bicycle and they made a bad weld, and it was the bad weld that caused the failure and that is a manufacturing defect. And under the current law, the distributor of the bike is responsible strictly for that defect. [¶] If I allow the jury to apportion on the basis of comparative fault . . . even though I'm telling them that Derby is strictly responsible, they have to find that the manufacturer's 100 percent responsible, so that nullifies the [strict product liability] law."

The jury found the fork assembly was defective, and awarded Wimberly $105,168 in economic damages $300,000 in noneconomic damages. The court deducted the $135,000 settlement from Taiwan An Len, for a net award of $270,168. The court denied Derby's motion for JNOV.

THE COURT CORRECTLY DETERMINED PROPOSITION 51 IS INAPPLICABLE[3]

I

"Before 1975, California's common law employed the traditional all-or-nothing system of tort responsibility. If the plaintiff's fault had contributed in any measure to his own injury, his recovery was barred, regardless of the fault of others. On the other hand, every defendant found somewhat responsible for an indivisible injury, no matter how slight his or her fault, was liable for all the damages incurred by the victim. An injured person could unilaterally choose which of several concurrent tortfeasors to sue, based on their ability to pay. Generally, one singled out for suit could not join other responsible parties, and the target defendant's right to contribution or indemnity from other concurrent tortfeasors was sharply restricted. [Citations.]" (*DaFonte* v. *Up-Right, Inc. (DaFonte)* (1992) 2 Cal.4th 593, 597-598 [7 Cal.Rptr.2d 238, 828 P.2d 140].) In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], the California Supreme Court "eliminated the all-or-nothing doctrine of contributory negligence. Thereafter, a plaintiff's recovery against others responsible for the injury could only be reduced in proportion to his or her own share of fault." (*DaFonte*, *supra*, 2 Cal.4th at p. 598.) In *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] (*AMA*), the court "concluded that *Li's* comparative fault principles did not abrogate each defendant's joint and several liability for damages attributable to the fault of others. [The court's] opinion adhered to the pre-*Li* principle that culpable defendants, rather than the injured plaintiff, should bear the risk of inadequate contribution by others responsible for the harm. [Citation.]"[4] (*DaFonte*, *supra*, 2 Cal.4th at p. 598.)

Although the judicial adoption of a comparative fault system "served to reduce much of the harshness of the original all-or-nothing common law rules, the retention of the common law joint and several liability doctrine produced some situations in which defendants who bore only a small share of fault for an accident could be left with the obligation to pay all or a large share of the plaintiff's damages if other more culpable tortfeasors were

---

[3]The interpretation of statutes presents questions of law subject to independent review on appeal. (*Board of Retirement* v. *Lewis* (1990) 217 Cal.App.3d 956, 964 [266 Cal.Rptr. 225].)

[4]In *AMA*, however, the court ameliorated the harshness of the joint and several rule by holding a defendant in a personal injury action could join other concurrent tortfeasors in the action in order to allocate proportionate responsibility, or could later seek equitable indemnity. (*AMA*, *supra*, 20 Cal.3d at pp. 604-607.) As was later made clear, any damages attributable to an insolvent tortfeasor are to be apportioned equitably among solvent tortfeasors. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1198 [246 Cal.Rptr. 629, 753 P.2d 585].)

insolvent." (*Evangelatos* v. *Superior Court*, *supra*, 44 Cal.3d at p. 1198.) In 1986 the voters modified this joint and several liability system with the passage of Proposition 51. The heart of the measure provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."[5] (Civ. Code, § 1431.2, subd. (a).)

Proposition 51 neither refers to strict liability nor defines "fault" or "comparative fault." As explained in Civil Code section 1431.1, however, the measure's purpose is to address perceived inequities of plaintiffs joining "deep pocket" defendants *even though there was little or no basis for finding them at fault. Under joint and several liability, if they are found to share even a fraction of the fault, they often are held financially liable for all the damage.* The People—taxpayers and consumers alike—ultimately pay for these lawsuits in the form of higher taxes, higher prices and higher insurance premiums." (Civ. Code, § 1431.1, subd. (b), italics added.)

As discussed below, the only "fault" required to find a defendant liable for injuries caused by a defective product is its participation in the chain of distribution. Plaintiffs suing in strict product liability therefore name such defendants even though they bear little "fault" because they are held fully responsible for damages caused by a defective product as a matter of public policy. It thus appears to us that facially, Proposition 51 has no application here. However, because it is arguably unclear, we extend our analysis.[6]

---

[5]"Economic" damages means "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." (Civ. Code, § 1431.2, subd. (b)(1).) "Non-economic damages" means "subjective, non-monetary losses including . . . pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).)

[6]This question whether Proposition 51 can be invoked by a strictly liable defendant to avoid or reduce its responsibility for noneconomic injuries caused by a defective product by shifting blame to other parties in the product's chain of distribution was recently addressed in *Moreno* v. *S.H. Kress & Co.* (Cal.App.). We agree with its well-reasoned analysis.

As noted by the California Supreme Court in rejecting a vagueness attack on Proposition 51, its language "may not provide a certain answer for every possible situation in which the modified joint and several liability doctrine may come into play . . . [W]hen situations in which the statutory language is ambiguous arise, [its] application can be resolved . . . 'in

## II

In California, "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."[7] (*Id.* at p. 63.)

In *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], the court extended strict liability to retailers, because "[t]hey are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.] In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases, the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike affords maximum protection

time-honored, case-by-case fashion,' by reference to the language and purposes of the statutory scheme as a whole. The judiciary's traditional role of interpreting ambiguous statutory language or 'filling in the gaps' of statutory schemes is, of course, as applicable to initiative measures as it is to measures adopted by the Legislature. [Citation.]" (*Evangelatos* v. *Superior Court, supra,* 44 Cal.3d at p. 1202.)

[7]In further explaining its rationale, the *Greenman* court deferred to Justice Traynor's concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-462 [150 P.2d 436], in which he observed: ". . . I believe the manufacturer's negligence should no longer be singled out as the basis of a plaintiff's right to recover [for injuries caused by a defective product]. . . . Even if there is no negligence . . . public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrences of others, as the public cannot. Those who suffer injury from defective products are unprepared to meet its consequences. The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching the market. However intermittently such injuries may occur and however haphazardly they may strike, the risk of their occurrence is a constant risk and a general one. Against such a risk there should be general and constant protection and the manufacturer is best situated to afford such protection."

to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." (*Id.* at pp. 262-263.)

With later expansions, a consumer injured by a defective product may now sue "any business entity in the chain of production and marketing, from the original manufacturer down through the distributor and wholesaler to the retailer; liability of all such defendants is joint and several. [Citations.]" (*Kaminski* v. *Western MacArthur Co.* (1985) 175 Cal.App.3d 445, 455-456 [220 Cal.Rptr. 895].) Derby argues this "joint and several liability" and the application of "comparative fault" principles in the strict product liability context show Proposition 51 applies here. We are unpersuaded.

## III

 As the court noted in *AMA, supra,* 20 Cal.3d at pages 586-587, the term "joint and several liability" has more than one meaning:

"In cases involving multiple tortfeasors, the principle that each tortfeasor is personally liable for any indivisible injury of which his negligence is a proximate cause has commonly been expressed in terms of 'joint and several liability.' As many commentators have noted, the 'joint and several liability' concept has sometimes caused confusion because the terminology has been used with reference to a number of distinct situations. [Citation.] The terminology originated with respect to tortfeasors who acted in concert to commit a tort, and in that context it reflected the principle, applied in both the criminal and civil realm, that all members of a 'conspiracy' or partnership are equally responsible for the acts of each member in furtherance of such conspiracy.

"Subsequently, the courts applied the 'joint and several liability' terminology to other contexts in which a *preexisting relationship between two individuals made it appropriate to hold one individual liable for the act of the other; common examples are instances of vicarious liability* between employer and employee or principal and agent, or situations in which joint owners of property owe a common duty to some third party. In these situations, *the joint and several liability concept reflects the legal conclusion that one individual may be held liable for the consequences of the negligent act of another.*

"In the concurrent tortfeasor context, however, the 'joint and several liability' label does not express the imposition of any form of vicarious liability, but instead simply embodies the general common law principle

. . . that a tortfeasor is liable for any injury of which his negligence is *a* proximate cause. Liability attaches to a concurrent tortfeasor in this situation not because he is responsible for the acts of other independent tortfeasors who may also have caused the injury, but because he is responsible for all damage of which his own negligence was a proximate cause." (*Id.* at p. 587, some italics added.)

■ Where a defendant's "joint and several liability" is not based on his or her own negligence, but on vicarious liability, defendant cannot invoke Proposition 51 to reduce or eliminate responsibility for plaintiff's noneconomic damages. For instance, in *Miller* v. *Stouffer* (1992) 9 Cal.App.4th 70 [11 Cal.Rptr.2d 454] (*Miller*), the court held that an employer liable for its employee's negligence was not "jointly and severally liable" for purposes of Proposition 51, because the doctrine of respondeat superior imposes liability irrespective of proof of the employer's fault. "Liability is imposed on the employer as ' "a rule of policy, a deliberate allocation of the risk." ' [Citation.] The 'modern and proper basis of vicarious liability of the master is not his [or her] control or fault but the risks incident to [the] enterprise.' [Citation.]" (*Id.* at p. 84.) The entire liability of the employer and its employee to the plaintiff is co-extensive. The employer, however, nonetheless enjoys Proposition 51's benefits because its liability for noneconomic damages is limited to the percentage of fault allocated to its employee. (*Miller, supra*, at p. 84.)

The *Miller* court noted, "[i]f, as [defendant] urges, a vicariously liable employer is no longer liable for noneconomic damages, and an injured party is limited to recovering noneconomic damages from the negligent employee, who as here may have little in the way of assets, victims would go uncompensated while employers would be able to avoid much of the risk incident to their enterprise. Nothing in Proposition 51 compels such a result." (*Miller, supra*, 9 Cal.App.4th at p. 84.) The court's reasoning is not limited to the respondeat superior situation, but is applicable where "for deliberate reasons of public policy, a defendant who is without fault is subject to vicarious liability for the negligence of another, pursuant to statute or case law." (*Id.* at p. 85.)

Similarly, in *Rashtian* v. *BRAC-BH, Inc.* (1992) 9 Cal.App.4th 1847 [12 Cal.Rptr.2d 411] (*Rashtian*), the court held Proposition 51 is inapplicable where a defendant is statutorily responsible for the negligence of a permissive user. "[I]n our view the application of [Proposition 51] necessarily requires *independently acting tortfeasors who have some fault to compare*. It can not [*sic*], as a matter of logic or common sense, be applied to those who are without fault and only have vicarious liability by virtue of some statutory

fiat." (*Id.* at p. 1851, italics added.) "The owner and the operator of the vehicle *are not joint tortfeasors in the traditional sense* . . . . While the owner may be a joint tortfeasor by reason of the vicarious liability which is statutorily imposed, he is not an *independent* tortfeasor. [Citation.]" (*Id.* at p. 1852.) The liability of the owner imposed by Vehicle Code section 17150 is *primary and direct as far as the injured third party is concerned.* However, as between the owner and the operator such liability is secondary." (*Ibid.*, some italics added.)

In *Srithong* v. *Total Investment Co.* (1994) 23 Cal.App.4th 721 [28 Cal.Rptr.2d 672] (*Srithong*), the court held Proposition 51 is inapplicable where a defendant's liability is not based on any wrongdoing, but on nondelegable duty, the rationale of which is " 'to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm[.]' [Citation.] The 'recognition of nondelegable duties tends to insure that there will be a financially responsible defendant available to compensate for the negligent harms caused by that defendant's activity[.]' [Citation.]" (*Id.* at p. 727.)

While strict product liability is not commonly referred to as "vicarious liability," in *Far West Financial Corp.* v. *D & S Co.* (1988) 46 Cal.3d 796, 813, footnote 13 [251 Cal.Rptr. 202, 760 P.2d 399], the court noted the concepts' similarities: "In many instances—for example, strict product liability—tort law places 'direct' liability on an individual or entity which may have exercised due care in order to serve the public policies of a fair allocation of the costs of accidents or to encourage even greater safety efforts than are imposed by the due care standard. (See, e.g., *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63. . . .) As a leading text on torts explains, *the modern justification for vicarious liability closely parallels the justification for imposing liability on the nonnegligent manufacturer of a product*: 'What has emerged as the modern justification for vicarious liability is *a rule of policy, a deliberate allocation of risk.* The losses caused by the torts of employees, *which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business.* They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large.' [Citation.]" (Italics added.)

Thus, it appears the reasoning of *Miller, Rashtian and Srithong* applies equally here. Derby argues those cases are inapposite, however,

because Civil Code section 1431.2, subdivision (a) refers to actions "based upon principles of comparative fault," and such principles have been applied in the strict product liability context. It relies upon *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162] (*Daly*), in which the decedent's family claimed a defective car door latch caused his death. The court held evidence of the decedent's intoxication and failure to wear a seat belt was properly admitted, and the defendant's liability for decedent's injuries would be reduced by the amount of his own negligence. (*Id.* at pp. 736-737.)

Where only a *portion* of the damage suffered is caused by a defective product, applying comparative fault does not frustrate the goals of strict product liability, because "[p]laintiffs will continue to be relieved of proving that the manufacturer or distributor was negligent in the production, design, or dissemination of the article in question. *Defendant's liability for injuries caused by a defective product remains strict.*" (*Daly, supra,* 20 Cal.3d at pp. 736-737, italics added.) Further, "[t]he principle of protecting the defenseless is likewise preserved, for plaintiff's recovery will be reduced *only* to the extent that his own lack of reasonable care contributed to his injury. The cost of compensating the victim of a defective product, albeit proportionately reduced, remains on defendant manufacturer, and will, through him, be 'spread among society.' " (*Id.* at p. 737.) And, "[t]he manufacturer's . . . incentive to avoid and correct product defects, remains; its exposure will be lessened only to the extent that the trier finds that the victim's conduct contributed to his injury . . . ." (*Ibid.*)

Derby also relies upon *Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441] (*Safeway*), where plaintiff's shopping cart injuries were caused by two things: Nest-Kart's manufacturing defect and Safeway's failure to maintain the cart. A jury found Nest-Kart strictly liable for 20 percent of plaintiff's damages and Safeway liable for 80 percent, based on strict liability and negligence. After the plaintiff's judgment was satisfied on an 80 percent-20 percent basis, Safeway moved for contribution of 30 percent from Nest-Kart, to achieve a 50-50 apportionment under contribution statutes. In holding comparative fault principles were applicable, the court found nothing in the rationale of strict product liability which conflicts with a rule apportioning liability between a strictly liable defendant and other responsible tortfeasors. Although it recognized a principal social policy served by product liability doctrine is to assign liability to a party who possessed the ability to distribute losses over an appropriate segment of society, it concluded this policy has never been viewed as absolute, requiring or permitting negligent tortfeasors who have also

contributed to the injury to escape all liability.[8] (*Safeway, supra,* 21 Cal.3d 322, 332.)

Obviously, the reasoning of *Daly* and *Safeway* is unsuited to the situation where, as here, the plaintiff's injuries were caused *solely* by a defective product and the only parties among whom "fault" can be apportioned under Proposition 51 are in its chain of distribution. In that circumstance, the potential reduction or elimination of a plaintiff's recovery for noneconomic damages through apportionment of "fault" would reallocate the risks accompanying use of defective products and utterly defeat the principal policy reasons for the adoption of strict product liability.

█ Strict liability is imposed "in order to relieve injured consumers 'from *problems of proof* inherent in pursuing negligence . . . and warranty . . . remedies . . . .' [Citations.]" (*Daly, supra,* 20 Cal.3d at p. 736.) To any extent the concept of "fault" applies, it is only " 'equated with the responsibility for placing a defective product into the stream of commerce . . . .' " (*Barrett* v. *Superior Court* (1990) 222 Cal.App.3d 1176, 1189 [272 Cal.Rptr. 304].) █ Derby contends that after Proposition 51, however, that type of "fault" remains sufficient only to impose liability for economic damages; a more egregious type of "fault" is required to impose liability for noneconomic damages. Yet, Derby argues this dual "fault" concept does not change plaintiffs' burden of proof. Nonsense. Plaintiffs suing in strict product liability would impermissibly be required to prove defendants' negligence in order to recover noneconomic damages. Contrary to Derby's apparent view, they will not be inclined to sit idly by while the defendants seek to substantially reduce their recovery by shifting blame to parties who may be insolvent or unavailable.

Further, potentially reducing or eliminating the defendant's responsibility for noneconomic damages would thwart the public policy of insuring the costs of injuries caused by defective products are borne by those putting them on the market, "rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d at p. 63.) Responsibility is to be fixed "wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." (*Escola* v. *Coca Cola Bottling Co., supra,* 24

---

[8]Derby also relies upon this court's holding that *in an indemnity action* arising out of strict product liability claims, "[w]rongdoing can be apportioned 100 percent to the manufacturer and zero percent to the innocent retailer." (*Standard Pacific of San Diego* v. *A.A. Baxter Corp.* (1986) 176 Cal.App.3d 577, 587 [222 Cal.Rptr. 106]; see also *Gentry Construction Co.* v. *Superior Court* (1989) 212 Cal.App.3d 177, 182-183 [260 Cal.Rptr. 421].) Neither case, however, concerned Proposition 51 or reducing *plaintiff's recovery* for damages caused by a defective product.

Cal.2d at p. 462.) Potentially leaving the plaintiff with little or no recovery for pain and suffering and other noneconomic damages disserves this purpose. Additionally, if parties in the chain of distribution can escape liability for noneconomic damages, which are frequently much greater than economic damages, they will avoid risks incident to their businesses, losses will not be spread throughout society and incentives for promoting safety will significantly decrease. (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d at pp. 262-263.)

In sum, the retention of "joint and several liability" of parties in a defective product's chain of distribution for the plaintiff's full damages without a showing of negligence is essential to the theory of strict product liability. Nothing in Proposition 51 compels dilution of the strict liability doctrine. To the contrary, the measure disapproves of joint and several liability for plaintiff's noneconomic damages only where there are "independently acting tortfeasors who have some fault to compare." (*Rashtian, supra,* 9 Cal.App.4th at p. 1851.) The parties in a defective product's chain of distribution are not joint tortfeasors in the traditional sense; rather, as a matter of law their liability to plaintiff is coextensive with others who may have greater "fault," as in other instances of statutorily or judicially imposed vicarious, imputed or derivative liability.

Accordingly, we hold Proposition 51 has no application in a strict product liability case where, as here, the plaintiff's injuries are caused solely by a defective product. A strictly liable defendant cannot reduce or eliminate its responsibility to the plaintiff for all injuries caused by a defective product by shifting blame to other parties in the product's chain of distribution who are ostensibly more at "fault," and therefore may be negligent as well as strictly liable. The defendant's recourse, if not precluded by *good faith settlement* principles, lies in an indemnity action. (*Far West Financial Corp.* v. *D & S Co., supra,* 46 Cal.3d at p. 817; *Standard Pacific of San Diego* v. *A.A. Baxter Corp., supra,* 176 Cal.App.3d at p. 592.)[9]

---

[9]"Several" liability for a plaintiff's noneconomic damages under Proposition 51 would apply in an action including strict product liability claims where the plaintiff's own conduct caused a calculable portion of his or her damages (*Daly, supra,* 20 Cal.3d at pp. 735-737), or one party is strictly liable for injuries caused by a defective product and another is liable for separate damages caused by independent negligence. (*Safeway, supra,* 21 Cal.3d at p. 332.) In such situations, because strict liability does not require proof of negligence, parties in the product's chain of distribution would be treated as a single unit for purposes of determining and allocating fault under Proposition 51.

Our holding makes it unnecessary to consider Derby's argument there was insufficient evidence of "fault" to apportion any amount of Wimberly's noneconomic damages to it.

## The Court Abused Its Discretion in Denying Wimberly's Motion for Costs of Proof

After prevailing at trial, Wimberly moved for $54,822 in attorney fees and other costs incurred in proving pivotal facts Derby denied in response to requests for admissions. On appeal, he persuasively argues the court abused its discretion in part in denying his motion.

"It is well established that although the principal aim of discovery procedures in general is to assist counsel to prepare for trial, requests for admissions are conceived for the purpose of setting to rest triable issues in the interest of expediting trial. [Citation.] Therefore, a party may request from the opposing party the truth of any facts . . . that [are] relevant to the subject matter of the action or reasonably calculated to lead to admissible evidence. [Citation.] Furthermore, since requests for admissions are not limited to matters within personal knowledge of the responding party, that party has a duty to make a reasonable investigation of the facts before answering items which do not fall within his personal knowledge. [Citations.]

"Where certain facts exist which the responding party does not intend to contest at trial, the proper time to admit and permit those facts to be established is during pretrial discovery. [Citation.] In the event, however, that the defendant denies a request for admission submitted by the plaintiff, he cannot be forced to admit the fact prior to trial despite its obvious truth. [Citation.]" (*Smith* v. *Circle P Ranch Co.* (1978) 87 Cal.App.3d 267, 273 [150 Cal.Rptr. 828].) Section 2033, subdivision (o) thus provides in part: "If a party fails to admit the . . . truth of any matter when requested to do so under this section, and if the party requesting that admission thereafter proves the . . . truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make this order unless it finds that (1) an objection to the request was sustained or a response to it was waived . . . (2) the admission sought was of no substantial importance, (3) the party failing to make the admission had reasonable ground to believe that that party would prevail on the matter, or (4) there was other good reason for the failure to admit."

An issue is of "substantial importance" if it has "at least some direct relationship to one of the central issues in the case, i.e., an issue which, if not proven, would have altered the results in the case." (*Brooks* v. *American*

*Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 [224 Cal.Rptr. 838], fn. omitted.) "[I]f a party denies a request for admission . . . in circumstances where the party lacked personal knowledge but had available sources of information and failed to make a reasonable investigation to ascertain the facts, such failure will justify an award of expenses . . . .[¶] The degree to which the party making the denial has attempted in good faith to reach a reasonable resolution of the matters involved is also an appropriate factor to be weighed. . . . [¶] Sometimes a party justifiably denies a request for admission based upon the information available at the time of the denial, but later learns of additional facts or acquires information which would have called for the request to be admitted if the information had been known at the time of the denial. If such a party thereafter advises . . . that the denial was in error or should be modified, a court should consider this factor in assessing whether there were no good reasons for the denial. [Citation.] On the other hand, if a party in such circumstance stands on the initial denial and then fails to contest the issue at trial, a court would be well justified in finding that there had been no good reasons for the denial, thus mandating the imposition of sanctions." (*Id.* at pp. 510-511, fns. omitted.)

The factual background here is as follows: On March 25, 1993, Wimberly propounded requests for admissions, seeking among other things Derby's admission the fork assembly was defectively manufactured. On June 1, Derby responded it could "neither admit nor deny '. . . that there was a manufacturing defect in the fork . . . ' as [Derby] did not manufacture said 'fork', was not present during the manufacturing process . . . and has not had said 'fork' examined by an expert witness knowledgeable in this area. However, [Derby] admits it's [*sic*] belief that the steerer tube component of said 'fork' was not comprised of the tubing specified by [Derby] . . . ."

Wimberly consequently had Dr. Fowler, his expert metallurgist, conduct testing which revealed the steerer tube broke because its metal was too thin and improperly welded. On November 10, Wimberly sent a second set of requests for admissions to Derby, again seeking its admission the fork assembly was defectively manufactured. Additionally, Wimberly sought Derby's admissions the defect was a proximate cause or sole proximate cause of his injuries, and his past and future medical expenses were reasonable and necessary.

On January 20, 1994, Derby unequivocally denied all requests for admissions. However, on January 26, it amended its denial regarding the manufacturing defect to state: "Based upon [an understanding of] the deposition testimony of Gary Fowler . . . defendant understands that a microscopic crack was introduced into the steerer tube of the forks . . . by [Taiwan] An

Len during the welding process." Derby also amended its denial to the requests for admission regarding causation to read:

"Defendant admits that Richard Cunningham specified non-rifled tubing for the steerer tube . . . and that the steerer tube being used by plaintiff at the time of his accident was rifled but denies that this in any way caused or contributed to plaintiff's injury.

"Defendant denies that the microscopic crack identified by Dr. Fowler as being caused by improper welding was the sole and legal proximate cause of injury to plaintiff."

Derby also amended its response regarding past medical care to admit it was necessary. However, with regard to future medical care, Derby stated: "Objection. Defendant cannot respond to this question as phrased. The request is vague and ambiguous as to what is 'claimed' by the plaintiff as well as to the extent of medical care the plaintiff seeks. To the extent defendant can respond, defendant denies that the extent of future medical care, including replacement of prosthetic implants is reasonable and necessary."

On February 25, a week before trial began, Derby again amended its response regarding a manufacturing defect as follows: "Based upon the analysis of defendant Derby's expert metallurgist, Chuck Morin, and upon the deposition testimony of Dr. David Douglas[s] [Taiwan An Len's designated expert witness], Derby denies that there was a manufacturing defect in the steerer tube of the subject forks." It also continued to deny causation: "[E]ven if a microscopic crack was introduced during the welding process, it was not a cause of injury to plaintiff."

At trial, however, Derby failed to produce any witness regarding the defect, causation or future medical care issues. The trial court nonetheless denied Wimberly's posttrial section 2033, subdivision (o) motion, finding Derby "had reasonable basis, the anticipated testimony of Expert, David Douglass, for denying the request for admissions regarding the defect and the causation. [Derby] objected to the request for admission regarding future medical care which was unchallenged by [Wimberly]." We agree Wimberly is not entitled to costs associated with the medical care issue, because he made no motion to compel a further response after Derby objected to the request for admission. (§ 2033, subd. (*l*).) We conclude, however, the court erred in finding, on this record, that Derby had a reasonable basis for its denial of defect and causation. ▮▮▮ Failure to award Wimberly

expenses incurred in proving the fork assembly was defective and the legal cause of his injuries, is an abuse of discretion.[10]

■ Derby seeks to justify its denials of the requested admissions on the ground of information it received from its expert, Dr. Morin, and on Dr. Douglass's deposition testimony. Derby, however, failed to designate its own expert witness in a timely manner, and thus any reliance upon Dr. Morin was misplaced as he could not testify at trial. Further, it is clear from the record that while Derby could have called Dr. Douglass (Taiwan An Len's designated expert) at trial, it never had that intention. Rather, Derby planned to rely solely upon Dr. Douglass's deposition testimony, arguing such was proper as he lived in Tucson, more than 150 miles from San Diego. When Debra Hurst, Wimberly's counsel, objected—because she merely elicited Dr. Douglass's opinions at his deposition and did not cross-examine him regarding perceived frailties therein—the trial court correctly determined Dr. Douglass's testimony was required to be live.[11]

At that point, Derby's counsel, John J. Hennelly, advised the court Dr. Douglass was on a ski vacation and unavailable. When the court asked where he was skiing, Hennelly said: "I'll have to check with his home in Tucson," but "[w]e're going to have to fly him in, bring him in tomorrow and delay." The court responded: "If he can get here, get him here." Later the same day, Ms. Hurst advised the court Dr. Douglass informed her law clerk in a telephone conversation he was not skiing, but at home in Tucson, and available for trial; however, Hennelly told him his testimony was unneeded. While that information was hearsay, Hennelly did not object or dispute its accuracy, but contradicted his earlier assertion by informing the court Dr. Douglass "was skiing *last* week." While observing it "didn't get a full picture of the situation," the court still gave Derby the opportunity to produce Dr. Douglass the following day, because the issues on which he would testify were central to Derby's defense. The court's minutes from the next day's proceeding, however, state Derby "represents that [it] will not call David Douglas[s] as a witness."

---

[10]The determination of whether a party is entitled to expenses under section 2033, subdivision (o) is within the sound discretion of the trial court. "On appeal, the trial court's decision will not be reversed unless the appellant demonstrates that the lower court abused its discretion." (*Brooks* v. *American Broadcasting Co., supra,* 179 Cal.App.3d at p. 508.) "[O]ne of the essential attributes of abuse of discretion is that it must clearly appear to effect injustice. . . ." (*Dorman* v. *DWLC Corp.* (1995) 35 Cal.App.4th 1808, 1815 [42 Cal.Rptr.2d 459].)

[11]In designating an expert witness, a party must represent "that the expert has agreed to testify at the trial." (§ 2034, subd. (f)(2)(C).) Section 2025, subdivision (u)(4) provides in part: "Any party may use a videotape deposition of a treating or consulting physician or of any expert witness even though the deponent is available to testify if the deposition notice . . . reserved the right to use the deposition at trial . . . ."

Unquestionably, the defect and causation issues were of "substantial importance." As the above facts establish, the only inference that can reasonably be drawn is that when Derby denied Wimberly's requests for admissions, it had no reasonable belief it could prevail on the causation and defect issues. Derby's misunderstanding of the law regarding the use of expert witness depositions in lieu of live testimony, or its hope Wimberly would not object, does not provide reasonable grounds for denying the requested admissions, and accordingly an award of expenses was mandated. Because Wimberly's request appears to include fees incurred before Derby denied his requests for admissions, however, which are disallowed (*Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 736-737 [34 Cal.Rptr.2d 283]), we remand the matter to the trial court for its determination of an appropriate cost award.

## DISPOSITION

The court's order denying Wimberly attorney fees and other expenses under section 2033, subdivision (o) is reversed, and the matter is remanded for determination of costs and fees in accord with this opinion. The judgment and the order denying Derby's motion for JNOV are affirmed. Wimberly to recover costs on appeal from Derby.

McDonald, J., and McIntyre, J., concurred.

The petition of appellant Derby Cycle Corporation for review by the Supreme Court was denied October 22, 1997. Kennard, J., was of the opinion that the petition should be granted.