HENRY HILL v. WILMINGTON CHEMICAL CORPORATION AND ANOTHER.
E. I. du PONT de NEMOURS & COMPANY AND ANOTHER, THIRD-PARTY DEFENDANTS.

156 N. W. (2d) 898.

March 1, 1968—No. 40,516.

338

*Larkin, Hoffman, Daly, Lindgren & Danielson, James P. Larkin,* and *Allan E. Mulligan,* for appellant.

*Cant, Haverstock, Beardsley, Gray & Plant, Franklin D. Gray,* and *Walter D. Ford,* for respondent du Pont.

*Gislason, Reim, Alsop & Dosland* and *Donald F. Hunter,* for respondent Shell.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order denying third-party plaintiff's motion for amended findings or, in the alternative, for a new trial; and third-party plaintiff's motion for a new trial as to third-party defendant E. I. du Pont de Nemours and Company on the ground of newly discovered evidence.

For a few years, Joseph S. Klehman had been engaged in selling a silicone-base water repellent as salesman and sales manager for companies which manufactured such products. While so engaged he decided to go into business for himself. He learned that E. I. du Pont de Nemours and Company (hereinafter referred to as du Pont) manufactured an organic titanate, which was a waxlike solid substance sold under the name of Tyzor H. S. and which, when dissolved in a solvent, was an effective water repellent. He consulted with William Brockett, a chemical engineer, and Dr. K. C. Johnson of du Pont, and was told that Tyzor H. S. could be dissolved in a petroleum solvent. In August 1961 he met with Robert H. Moyer, a representative of du Pont, and through Moyer contacted Shell Oil Company. Shell recommended a solvent called Shell Sol B (later changed to Sol B8). A sample of Sol B arrived at the du Pont Clifton, New Jersey, plant, and Klehman tested it and decided that it was the solvent he wanted to use.

In 1961 the Wilmington Chemical Corporation (hereinafter called Wilmington) was organized by Klehman to manufacture and sell his water repellent, which he named X-33. Klehman was the sole owner of Wilmington, so any knowledge Klehman had is imputable to Wil-

mington. (The names will be used interchangeably.) He decided to establish his base of operations in Chicago and, through the Shell Oil Company, located a concern there that would mix and package the final product for him. He began operations, and purchased the solvent Sol B8 in truckloads from Shell in Chicago.

The product was placed in cans of various sizes and sold to retail dealers for resale to the general public. Originally, the shipments went out under a paper label, but in May 1962 Klehman ordered lithographed labels. The labels had warnings on them that the product was highly flammable and should not be used except in places well ventilated. A can of the product was sold by Wilmington to defendant Paul Brandt, a retail merchant of Sherburn, Minnesota, and by him to plaintiff, Henry Hill. Hill took the can home and began to apply the product to the steps of a passageway leading into the basement of his house. The passageway was enclosed, except for a door at the top, which was open. As Hill was applying the product to the steps, it ignited and he was severely burned. He sued Wilmington and Brandt, alleging negligence and breach of implied and express warranty. Wilmington filed a third-party complaint against Shell and du Pont for indemnity, alleging negligence on their part and also breach of warranty.

Wilmington and Brandt effected a settlement with Hill for the sum of $8,000, and the case thereafter was tried and submitted to the jury on the issues raised between Wilmington and Shell and du Pont. No one has raised any issue concerning the settlement.

The case was submitted to the jury on special interrogatories. The jury found that Shell was negligent, proximately causing the loss sustained by Wilmington on account of the injuries to Hill; it found du Pont not negligent proximately causing the loss; it found Wilmington negligent, proximately causing Henry Hill's injury; and, finally, that the negligence of Wilmington superseded the negligence of Shell. The trial court set aside the answer to the first question and held that Shell was not guilty of negligence proximately causing the loss sustained by Wilmington.

While it is not clear whether the court found Shell was not guilty

of negligence or, if it was, that the negligence was not a proximate cause, we gather from the court's memorandum that the decision is based rather on a finding that the negligence of Shell, if any, was not a proximate cause. The court refused to submit breach of warranty to the jury.

The questions before us relate largely to a determination of whether Shell was guilty of any negligence, that is, did it violate a legal obligation it owed to Wilmington,[1] and, if so, was its negligence a proximate cause of Wilmington's loss?

■ The motion for a new trial against du Pont is based on newly discovered evidence. During the trial Klehman claimed that du Pont, through its employee Moyer, had an active part in selecting Sol B as the solvent to be used in the preparation of X-33 and therefore Moyer and the other du Pont employees whom he consulted, being chemists, were under a duty to warn him of the dangerous propensities of the solvent selected. It was claimed that a shipment of Sol B was sent to du Pont to be used in the original experiment made to determine if it would be a desirable solvent. This was denied by Moyer. On the motion for new trial it was claimed that a bill of lading which could not be found prior to trial was found thereafter disclosing that a can of Sol B was shipped to du Pont. There is no showing that the can, if received, was used to experiment with Wilmington's product.

A careful examination of the record discloses that at best Moyer was only an intermediary in bringing Klehman into contact with a representative of Shell. Klehman made his own decision to use Sol B after experimenting with it. There is nothing in the record to indicate that Moyer or any other representative of du Pont had any active part in selecting or recommending the use of Sol B. On the record, the verdict of the jury as to this point is amply sustained by the evidence.

■ A new trial based on newly discovered evidence will not be granted where such evidence would not affect the outcome of the trial. State v. Warren, 252 Minn. 261, 89 N. W. (2d) 702. We are convinced that the decision was completely correct as far as du

---

[1] See, Prosser, Torts (3 ed.) § 53.

Pont was concerned and that even with the newly discovered evidence the outcome could not be otherwise.

■    Appellant challenges the trial court's authority to set aside the jury's answer to question 1. The court has the same authority to set aside an answer to a special interrogatory where a special verdict is used as it has to grant judgment notwithstanding the verdict if the evidence is insufficient to sustain the verdict. Rules governing both actions are the same. The question here, as in one involving a general verdict, is whether there is any substantial evidence to sustain the finding. In this case we have an additional complication in that the court submitted negligence and proximate cause jointly. Under these circumstances, the answer to question 4 was inconsistent with the answer to question 1. Intervening cause presupposes that there was negligence by one actor but that the negligence of another insulated it from being a proximate cause. The court here resolved the inconsistency by changing the jury's answer to question 1. In the view we take of the evidence, it was proper to do so because the evidence does not sustain the finding of negligence.

■■    With respect to Shell the question is whether Shell, knowing the dangerous propensities of Sol B, failed to warn Klehman so that he could in turn either dispense with its use or adequately warn the public of the existing dangers.

This is not a case where a manufacturer of a product, through an intermediary, places the finished product upon the market. Shell had no contact with the ultimate user. It sold its product to Wilmington who, in turn, manufactured a finished product—with Shell's product as only an ingredient—and placed the finished product on the market. Shell had no opportunity or duty to warn the ultimate consumer. It neither packaged nor placed the product on the market. Wilmington prepared the label on the package giving warning as to the proper use of the product.[2] Shell's duty was to inform Wilmington

---

[2] Had the consumer followed the instructions on the label not to use the product except in a well-ventilated place there probably would have been no accident. That issue is not before us in view of the settlement made by Wilmington with plaintiff.

of dangers inherent in the use of Sol B not known to Wilmington. If Wilmington had adequate knowledge of the dangerous propensities of the product sold by Shell, no further duty rested on Shell to give an additional warning. That Wilmington had such knowledge is evident from the testimony of Klehman himself. Among other things, he testified as follows:

"Q.   Well, Mr. Klehman, when it came to you, this knowledge about this Hazardous Labeling Act, you knew at that time that you were dealing with a hazardous substance, did you not?

"A.   Yes, sir.

\*     \*     \*     \*     \*

"Q.   All right. Now, then, did it mean anything to you, Mr. Klehman, that the gentleman from the can company put on your label the words, in capital letters, 'Danger, harmful or fatal if swallowed, extremely flammable.' Did that mean anything to you?

"A.   Well, of course it meant something to me.

"Q.   Did it mean to you that you were dealing with an extremely flammable product?

"A.   Yes, of course it did."

Wilmington prepared a cautionary sticker,[3] which it placed on the cans originally shipped to purchasers, which read:

"DANGER: Harmful or Fatal if Swallowed—Extremely Flammable. CONTAINS PETROLEUM DISTILLATE. If Swallowed, Do Not Induce Vomiting. CALL PHYSICIAN IMMEDIATELY. COMBUSTIBLE. Keep away from heat and open flame. Use with adequate ventilation. Avoid prolonged contact with skin and breathing of vapor or spray mist. Do not transfer contents to bottles or other unlabeled containers. Close container after each use. Extinguish all pilot lights. KEEP OUT OF THE REACH OF CHILDREN."

The first shipment of X-33 was made on April 9, 1962. Shortly

---

[3] Shell had nothing to do with preparation of this sticker. In March 1962 its representative had told Klehman to see his attorney concerning the label requirements.

thereafter, Klehman learned of the Federal Hazardous Substance Labeling Act, under which he was required to have warning labels on a product such as X-33 under Federal law. He did not take steps to correct the original labels until November 12, 1962. In the meantime, on September 28, 1962, he received a letter from a du Pont representative, saying, in part:

"Since we continued to receive complaints concerning the labeling of your 'X-33,' we felt it desirable to call your attention to the existence of the Federal Hazardous Substance Labeling Act. A copy of this Act as published in the FEDERAL REGISTER August 12, 1961, is enclosed.

"Specifically, I wish to call your attention to Paragraphs 191.1(j), 191.13 and 191.101. These deal with the Act's definiton of their test to determine 'flammability' as well as appropriate labeling requirements. We urge that if you have not already done so you discuss this matter immediately with legal counsel, determine your position with regard to this Act and be guided accordingly. We, of course, have no definite knowledge as to the flammable nature of your product 'X-33.' We hope, therefore, that you will take this letter in the manner in which it is written, namely, as a friendly warning from a supplier to his customer."

It should be kept in mind that all du Pont supplied was Tyzor H. S., which in itself was not flammable. It was mixed 2 parts Tyzor to 98 parts Sol B by weight.

In response to the above letter, Mr. Klehman wrote du Pont in part:

"Sometime last May I became aware of the existence of this new Act which I understood was to become effective August 1, 1962. I immediately took steps to see to it that all of labeling material as well as the rest of our literature was in accordance with this new legislation.

"*Consultations were held with Shell Oil Company concerning the flammability of their solvent,* and also with National Can Company

who are in the process of revising labels on their lithographed cans for many of their customers." (Italics supplied.)

Stickers designed to assure that the original labels complied with the Federal act were sent out to dealers in November 1962. The obligation to affix the stickers was left with the dealers. While a sticker was apparently placed on the can sold to plaintiff, the evidence is that it was not on the can when he purchased it. Klehman had a complete list of the dealers who had received his product with the inadequate warning on it, and nothing further was done to alert the dealers until October 1963, when he sent a form letter to them to hold X-33 or remove it from their shelves. The can which caused plaintiff's injury was sold to him, and the accident occurred on July 20, 1963, long after Klehman had been warned by both Shell and du Pont of the necessity of properly labeling the product he was selling.

As has been stated above, Shell's only connection with the sale of the product was to supply to Wilmington one of the ingredients used in it. Liability on the part of Shell, if there is any, must rest on its superior knowledge of the dangerous propensities of the product it supplied to Wilmington with knowledge of the use to which it was to be put. Inasmuch as the evidence is conclusive that Wilmington already had such knowledge, there would be no legal obligation on the part of Shell to furnish that knowledge.

Several cases have dealt with matters of this kind in terms of intervening cause, but we think here the failure of proof lay in a failure to prove negligence. For authorities involving intervening cause, see 65 C. J. S., Negligence, § 100(2); 38 Am. Jur., Negligence, § 72; Ford Motor Co. v. Wagoner, 183 Tenn. 392, 192 S. W. (2d) 840, 852, 164 A. L. R. 364; Nishida v. E. I. du Pont de Nemours & Co. (5 Cir.) 245 F. (2d) 768.

Under these circumstances, we think the trial court was correct in holding that any negligence of Shell did not proximately cause the loss sustained by Wilmington.

We again emphasize the fact that it would be better to submit the questions of negligence and proximate cause separately so that we

would have some knowledge of the basis upon which the court made its decision. Here there is no way of knowing, but we are convinced that under the circumstances of this case the evidence does not sustain a finding of negligence; and even if it does, such negligence was not a proximate cause in view of the knowledge which Klehman had of the dangerous propensities of the product supplied by Shell for use by Klehman.

We find no error in refusing to submit breach of warranty. Shell's liability, if any, rests on its failure to warn Wilmington of the dangers inherent in the use of the product it sold. If, as we hold, there was no legal obligation to warn, due to the knowledge Wilmington already had, there could be no liability for indemnity based on breach of warranty.

Affirmed.