63 Cal.App.4th 1178 (1998)
ELIZABETH ARENA, Plaintiff and Respondent,
v.
OWENS-CORNING FIBERGLAS CORPORATION et al., Defendants and Appellants.
Docket No. A077005.
Court of Appeals of California, First District, Division One.
May 12, 1998.
*1181 COUNSEL
Brobeck, Phleger & Harrison, Thomas Peterson, Tilly & Graves, Camille K. Fong, Parker & Bonis, James C. Parker, Stevens, Drummond & Gifford and Gary T. Drummond for Defendants and Appellants.
Brayton, Harley, Curtis, Philip A. Harley and James L. Oberman for Plaintiff and Respondent.
[Opinion certified for partial publication.[*]]
OPINION
DOSSEE, J.
Owens-Corning Fiberglas Corporation (Owens Corning) and Asbestos Corporation Limited (ACL) appeal from a judgment in favor of respondent Angelo Arena, awarding damages for injuries resulting from occupational exposure to asbestos. We conclude that a supplier of raw asbestos is subject to strict products liability, and in particular, to the consumer expectations test of a product defect. We agree with appellants that the trial court erred in failing to anticipate the Supreme Court's decision that Proposition 51 applies to cases like the instant case in Buttram v. Owens-Corning Fiberglas Corp. (1997) 16 Cal.4th 520 [66 Cal. Rptr.2d 438, 941 P.2d 71]. We also conclude that Proposition 51 is applicable to the instant asbestos case even though it is based solely on a strict products liability theory. Because we have determined that Proposition 51 applies here, we must remand the case for a determination of the proper allocation of noneconomic damages.
.... .... .... .... .... .... .... .[*]

*1182 I

BACKGROUND

Respondent's Occupational Exposure to Asbestos
Respondent, Angelo Arena, was exposed to asbestos between 1946 and 1977, while working as a machinist and engineering technician at the Puget Sound Naval Shipyard in Washington State.[1] Respondent, who was unable to travel due to his illness, testified via videotaped deposition regarding his career as a machinist. At first he worked in the engine rooms of ships with pipe fitters, electricians, and insulators who were installing and removing asbestos insulation. The insulation was a gray powder which was mixed and formed before it was applied to the pipes on the ships. He recalled when the workers were tearing out insulation the area was "one big cloud of ... asbestos dust." At those times, he was given no breathing protection device and the dust got on his clothes and face. Respondent was never warned about the dangers of breathing asbestos.
In 1951, respondent's job title was changed to engineering technician. His duties then included ordering parts which involved visiting the shipyard's shops and vessels. In this capacity, respondent inspected and inventoried equipment in "Shop 56," where the asbestos was mixed. He recalled that the dust was so thick in Shop 56 that he would breathe through a folded handkerchief. When he left Shop 56, there was dust on his clothing, which he shook off with his bare hands. He visited Shop 56 once or twice a year. Other places that he worked, such as engine rooms and storage spaces, also contained dust from asbestos products.

Methods of Installation and Removal of Appellants' Products
The asbestos products of appellants Owens Corning and ACL, along with those of other manufacturers, were used extensively at Puget Sound Naval Shipyard. Owens Corning manufactured an asbestos product called "Kaylo." Prior testimony of Lewis Saxby, a former Owens Corning executive, established that Owens Corning became the exclusive distributor for Kaylo in 1953 or shortly thereafter. In 1958, Owens Corning bought the division of Owens-Illinois which manufactured Kaylo. Appellant ACL, a Quebec corporation, supplied asbestos fibers to Eagle-Picher Industries, Inc., between 1935 and 1957. Eagle-Picher, which was under bankruptcy protection at the time of trial, produced an insulating cement containing asbestos known as Eagle 66 or Super 66.
*1183 Kaylo was a calcium silicate and asbestos pipe insulation product that was cut to fit the pipes with saws, rasps, and knives. Eagle 66 or Super 66 was a high-temperature asbestos-containing cement made by Eagle Picher Industries, Inc. It came in bags and was mixed by hand in a bucket. Charles Ay, a former insulator and currently a certified asbestos consultant, described standard methods of installing and removing asbestos insulation procedures aboard ships like the ones which respondent worked on. Insulation is installed by altering it to fit the pipe, wiring it in place, sealing the joints with high temperature cement or "mud," and covering it with a fiberglass jacketing and finish cement. The common method for mixing the Eagle 66 cement was to use old paint cans, fill them half full with water, pour the cement into the cans, and agitate them to mix it. This operation was a heavy dust-producing process.
The work of cutting and removing the Kaylo pipe covering was also a continuous dust-producing operation. Machinists, pipe fitters and insulators all helped to remove the insulation from the ships. Normally, workers ripped it off with a pick or hatchet, and left it on the deck. In naval work, the different tradesmen worked on the ship at the same time. Thus, insulators, machinists, sheet metal workers, electricians and others would all be working in the same area on the ship when the asbestos was being applied or removed. Across the country, the insulation work off the ship was done in the pipefitter's shop. According to uniform terminology in the Navy, every trade had a common numerical shop designation. The pipe fitter's shop was always called "Shop 56." Ay visited the Puget Sound Naval Shipyard in 1976. He noted that operations were conducted there just as he had described.

Medical Evidence of Asbestos Causation
Medical evidence described the progress of appellant's condition, the nature of asbestos diseases in general, and the mechanics of how inhaling asbestos fiber causes cancer. Dr. Samuel Hammar, respondent's expert pathologist, testified that asbestos fibers cause cellular and DNA changes associated with cancer and asbestosis. The body reacts immediately upon inhalation of the fibers, producing scarring in the lungs, referred to as "pleural plaques." Although scar tissue probably begins forming fairly soon, early cellular changes are not clinically detectable.
Dr. Hammar testified that a negative 1995 cytology report on respondent's pleural fluid did not necessarily mean he did not have cancer. Cytology reports are negative in roughly half of the people who eventually are diagnosed with mesothelioma. The fact that the fluid in respondent's sample *1184 was bloody was a sign that is frequently associated with malignancies. Dr. Hammar confirmed that respondent would not be a good candidate for surgery, and that there is no effective treatment for mesothelioma. Respondent's X-rays in 1994 did not show an effusion or any evidence of a mass, but the late 1995 X-ray did disclose a mass and the effusion. Based on his review of respondent's laboratory reports and clinical history, Dr. Hammar believed that the most likely cause of respondent's bloody pleural effusion was mesothelioma. Dr. William Meseroll, a radiologist, and Dr. Carolyn Ray, respondent's pulmonologist, also testified that the mass in respondent's lung was probably mesothelioma.

The Instant Litigation
On February 8, 1995, respondent filed a complaint seeking damages against multiple defendants for injuries arising from his exposure to asbestos.[2] His motion for trial preference due to his terminal illness was granted on February 15, 1996. On June 5, 1996, the parties waived a jury trial. On June 17, 1996, Owens Corning filed a motion arguing that the Washington statute of limitations barred the action. The trial court denied the motion. The trial court admitted, over objection, the deposition transcript of Eagle Picher manager Robert Bockstahler taken in other asbestos cases.
The trial court filed its final decision on September 10, 1996, concluding that respondent had demonstrated that he suffered from either lung cancer or mesothelioma caused by his exposure to asbestos, and that ACL and Owens Corning products were a substantial factor in causing the illness. The court concluded that Proposition 51 did not apply and awarded joint and several damages of $388,820.35. ACL filed a motion for new trial on October 25, 1996, which was, apparently, denied by operation of law. Owens Corning and ACL appeal.

II

DISCUSSION
.... .... .... .... .... .... .... .[*]

A. Consumer Expectations Test Applies to Supplier of Raw Asbestos

(1a) The instant case was tried on a consumer expectations theory of product defect. The trial court relied on Jenkins v. T&N PLC (1996) 45 *1185 Cal. App.4th 1224 [53 Cal. Rptr.2d 642] to conclude that the consumer expectations test applied to this case. ACL and amicus curiae, Cassiar Mining Corporation, argue that the consumer expectations test cannot be applied to raw asbestos because it presupposes an analysis of a product that is designed.[3] Amicus curiae argues that raw asbestos, being incapable of being designed, can not be defective by virtue of its design. To support this argument, amicus curiae analogizes asbestos to rat poison, contending that a consumer may (correctly) expect rat poison to be dangerous. Despite its dangerous nature, rat poison is not defective if properly labeled with appropriate warnings.[4] Here, however, the issue does not concern the circumstances under which a product that is ordinarily perceived as dangerous can be deemed defective, but whether the ordinary consumer, at the time of respondent's exposure, expected that normal use of asbestos was dangerous.

Nature of the Tests for a Design Defect
(2) Products liability law utilizes three methods to demonstrate that a product has a design defect. "First, ... a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." (Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 429 [143 Cal. Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) The consumer expectations test asks if the reasonable minimum safety expectations of the product's ordinary consumers were violated. (Soule v. General Motors Corp. (1994) 8 Cal.4th 548 [34 Cal. Rptr.2d 607, 882 P.2d 298].) The second test is the "risk-benefit" test, which balances the risk of danger inherent in a challenged design against various factors including the feasibility of a safer design, the cost of such a design, the gravity of the danger, and the adverse consequences to the product of an alternative design. (Id. at p. 568; Barker, supra, at p. 418.) The third design defect test involves a failure to warn of known or knowable inherent dangers in the product. (Anderson v. Owens-Corning Fiberglas Corp. (1991) 53 Cal.3d 987, 995, 1004 [281 Cal. Rptr. 528, 810 P.2d 549].) The instant case was tried solely on a consumer expectations theory pursuant to plaintiff's express election.
(3) Although the proposed final draft of the Restatement Third of Torts: Products Liability, rejects the consumer expectations test as an independent *1186 theory, our Supreme Court declined an invitation to overrule the test, and established it as an independent and alternative test for a product defect. (Rest.3d Torts: Products Liability (Proposed Final Draft, Apr. 1, 1997) § 2, & com. g, p. 29; Soule v. General Motors Corp., supra, 8 Cal.4th 548.) Soule states that the consumer expectation test applies in "cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design." (Id. at p. 567, italics omitted.) A plaintiff may show the objective condition of the product, and the fact finder may use its own "`sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence.'" (Id. at p. 563.) A defendant may not rebut such a claim with evidence of the design's relative risks and benefits because the risk-benefit test is only applicable when a defect goes "beyond the common experience of the product's users." (Id. at p. 567.)
Examples of the proper use of each test are provided in Soule, which involved an automobile collision. The plaintiff's theory of a design defect in Soule was "one of technical and mechanical detail" (8 Cal.4th at p. 570), involving a defect in the weld that attached an automobile's lower control arm bracket to the frame of the wheel assembly. In a crash, the weld failed, thereby causing the wheel to collapse and hit the underside of the "toe pan," which in turn, crumpled into the passenger compartment, and injured the plaintiff. (Id. at p. 557.) The Soule court noted that the consumer expectation test might be applied where an automobile exploded while idling at a stop light, but not where the defect was complex and technical, because an ordinary consumer would have no reasonable experience or expectation about a car's frame, suspension, or interior performance in a crash. (Id. at pp. 566-567, fn. 3, 570.) Soule demonstrates that the consumer expectation test merely looks at the condition of the product and the ordinary expectations regarding its safety, and does not imply a requirement that the product be processed or manufactured.

Application of Design Defect Tests to Asbestos Products
(1b) Amicus curiae and ACL use the terms "design defect" in too literal a manner when arguing that asbestos cannot be defectively designed. The term "design defect" as described in Barker v. Lull Engineering Co., supra, 20 Cal.3d 413, 429 relates more to a legal conclusion that a product has deviated in some manner from what is reasonably expected, than it does to a description of a specific mechanical shortcoming or flaw. (See American Law of Products Liability (3d ed. 1997) § 28:1, pp. 28-8 to 28-9 [discussing multiple meanings of term "defective"].) To the extent that the term "design" *1187 merely means a preconceived plan, even raw asbestos has a design, in that the miner's subjective plan of blasting it out of the ground, pounding and separating the fibers, and marketing them for various uses, constitutes a design.[5] As stated in Soule, when that design violates minimum safety assumptions, it is defective. (Soule v. General Motors Corp., supra, 8 Cal.4th 548, 567.) Whether or not the defendant is able to design the product in a different way is irrelevant, as the Supreme Court neither requires nor allows proof of the existence of a better design under the consumer expectation test. (Id. at p. 567.)
Courts have applied the consumer expectation test to asbestos-containing insulation products. For example, in Morton v. Owens-Corning Fiberglas Corp. (1995) 33 Cal. App.4th 1529 [40 Cal. Rptr.2d 22], Division Two of this court, relying on Soule, determined that asbestos products were subject to the test because they did not involve complicated design considerations or obscure components, and esoteric circumstances do not surround the injury. (Id. at p. 1535.) The Morton court followed its earlier decision in Sparks v. Owens-Illinois, Inc. (1995) 32 Cal. App.4th 461 [38 Cal. Rptr.2d 739]. In Sparks, Owens-Illinois argued that its Kaylo product was designed as safely as possible, and therefore was not defective. Analyzing the holding in Soule, the court determined that Kaylo was a simple product that emitted asbestosladen dust during normal use. The emission of toxic respirable fibers that were capable of causing a fatal disease constituted a product failure that violated the commonly accepted assumptions of ordinary consumers. (Id. at pp. 474-475.) ACL and amicus curiae argue that the liability imposed in Morton and Sparks cases, which involved asbestos-containing products, cannot be applied to a supplier of raw asbestos. This is contrary to the result in Jenkins v. T&N PLC, supra, 45 Cal. App.4th 1224, relied upon by the trial court in the instant case.

Strict Products Liability Applies to Suppliers of Raw Asbestos
Jenkins v. T&N PLC, supra, 45 Cal. App.4th 1224 determined that a supplier of raw asbestos is strictly liable for harm caused by the product. ACL argues that Jenkins was wrongly decided for several reasons. ACL first *1188 contends that Jenkins improperly failed to discuss Walker v. Stauffer Chemical Corp. (1971) 19 Cal. App.3d 669 [96 Cal. Rptr. 803], which refused to impose liability on a mere supplier of a standard chemical ingredient. Next, ACL attempts to distinguish the cases relied upon by the Jenkins court. (Menna v. Johns-Manville Corp. (D.N.J. 1984) 585 F. Supp. 1178; Hammond v. North American Asbestos Corp. (1983) 97 Ill.2d 195 [73 Ill.Dec. 350, 454 N.E.2d 210, 39 A.L.R.4th 385].) Finally, relying on out-of-state cases and a proposed draft of the Restatement Third of Torts, ACL argues that its view is accepted by many authorities. We, however, agree with Jenkins and do not find the other authorities cited by ACL supportive.
In Jenkins v. T&N PLC, supra, 45 Cal. App.4th 1224, the court noted that raw asbestos fibers do not change when they become a component part of another asbestos product. This fact alone distinguishes asbestos from the sulfuric acid supplier's drain cleaning product in Walker. When used by defendant's tenant, the product exploded, injuring the plaintiff. (Walker v. Stauffer Chemical Corp., supra, 19 Cal. App.3d 669, 671.) The Walker court expressly stated: "The compounding [of the drain cleaning product] entailed a change in the physical composition of the bulk acid calculated to render it suitable as a household product. The bulk sulfuric acid was substantially altered, not only as to its chemical composition, but as to the container form in which it was distributed." (Id. at p. 672.) For this reason, Walker refused to extend strict liability to the producer of a product that had been substantially changed. (Id. at pp. 672, 674.) Walker belongs in the group of cases that involve nondefective raw materials or components supplied by the so-called upstream suppliers who have no control over alterations by the manufacturer of the final product. (Bay Summit Community Assn. v. Shell Oil Co. (1996) 51 Cal. App.4th 762, 772 [59 Cal. Rptr.2d 322]; see also Wright v. Stang Manufacturing Co. (1997) 54 Cal. App.4th 1218 [63 Cal. Rptr.2d 422] [rejecting the component part supplier's defense and distinguishing Walker because the raw material in Walker was not intended to reach the consumer in the same condition as it left the manufacturer]; and Artiglio v. General Electric Co. (1998) 61 Cal. App.4th 830 [71 Cal. Rptr.2d 817] [silcone supplier not liable to user of breast implants where material was processed by manufacturer].) Walker does not provide the rule in this case because incorporating raw asbestos into an insulation product does not substantially alter ACL's product.
ACL argues that Jenkins was wrongly decided because it improperly relied on the cases of Menna v. Johns-Manville Corp., supra, 585 F. Supp. 1178, and Hammond v. North American Asbestos Corp., supra, 454 N.E.2d 210. ACL contends that those cases addressed the separate issue of whether raw asbestos can be considered a "product," and both cases involved factory *1189 workers who worked directly with the raw asbestos in the manufacture of end products. These distinctions between Menna and Hammond and the facts of this case make no difference in the result we reach.
Regarding the first point, ACL argues that Menna and Hammond are distinguishable because the defendants in those cases argued that raw asbestos from the mine is not a "product," because it is not manufactured or otherwise processed. ACL's argument concedes that asbestos is a product, but contends that the consumer expectation test is inappropriate in identifying a defect. Both Menna and Hammond held that whether the raw asbestos fiber is processed before it is sold does not determine its status as a product. (Hammond v. North American Asbestos Corp., supra, 454 N.E.2d 210, 215; Menna v. Johns-Manville Corp., supra, 585 F. Supp. 1178, 1183.) The Menna court noted that there was no evidence presented that the process of manufacturing asbestos products either altered or increased the danger of asbestos exposure, stating: "It is well documented that exposure to asbestos dust can have pathological consequences whether the dust emanates from processed or unprocessed asbestos." (Id. at p. 1183.)
Similarly, Hammond noted that most "products" for purposes of strict liability, have undergone some degree of processing. However, Hammond explained that strict liability is not restricted to processed products, citing section 402A of the Restatement Second of Torts, comment e: "`The rule [imposing strict liability for defective products] is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated.' (Restatement (Second) of Torts, sec. 402A, comment e, at 350 (1965).)" (Hammond v. North American Asbestos Corp., supra, 454 N.E.2d 210, 215.) While the issue was cast in different terms in Menna and Hammond, the result in those cases is relevant to ACL's claim. Irrespective of the manner in which the issue was posed, those cases determined that whether or not the product is processed, it is capable of being defective.
ACL's second distinction between the case at hand and Menna and Hammond, is that the plaintiffs in Menna and Hammond worked directly with raw asbestos, rather than finished insulation products. (Hammond v. North American Asbestos Corp., supra, 454 N.E.2d 210, 213; Menna v. Johns-Manville Corp., supra, 585 F. Supp. 1178, 1180.) ACL argues that it should have no liability to a plaintiff who works with a finished product rather than raw asbestos, because the design of the manufactured product is not ACL's responsibility. As noted in Menna, however, it is not the manufacturing process that creates the dangerous propensity of the asbestos, nor does the manufacturing process change the nature of the asbestos. (Menna v. *1190 Johns-Manville Corp., supra, 585 F. Supp. 1178, 1182.) Neither Hammond nor Menna relied on the fact that the workers worked directly with raw asbestos in reaching the conclusion that a supplier of the raw asbestos was subject to the doctrine of strict liability. We find that the factors ACL uses to distinguish Hammond and Menna were not critical to the result in those cases and do not change our analysis of the issue at hand.
Unlike the plaintiffs in Hammond and Menna, the plaintiff in Jenkins was exposed to an asbestos-containing pipe insulation product. (Jenkins v. T&N PLC, supra, 45 Cal. App.4th at p. 1226.) Like ACL, the defendant in Jenkins was a supplier of raw asbestos that did not manufacture a finished product. (Id. at p. 1227.) The Jenkins court concluded that even when raw asbestos is incorporated into a finished product, it is the raw asbestos, and not some defect in the finished product, that ultimately causes the harm. The court agreed with the language in Hammond that "`"[t]here was no change in the condition of the asbestos from the time it was sold until it reached the `ultimate user.'"'" (Jenkins v. T&N PLC, supra, 45 Cal. App.4th 1224, 1229.) Contrary to ACL's argument, Jenkins did not limit its holding to the determination that asbestos is a "product." Jenkins expressly concluded: "... a bulk supplier of raw asbestos fiber incorporated into a finished product can be subject to strict products liability to an individual suffering from a disease caused by exposure to the supplier's asbestos." (Id. at p. 1231.) The holding in Jenkins directly applies to the resolution of ACL's argument in the instant case.
ACL's final objection to Jenkins is that it ignores the general rule of nonliability of ingredient suppliers. ACL cites Hill v. Wilmington Chemical Corporation (1968) 279 Minn. 336 [156 N.W.2d 898], and Shell Oil Co. v. Harrison (Fla. Dist. Ct. App. 1982) 425 So.2d 67, as examples of cases that uphold that general rule. These cases involve ingredients that are changed by their incorporation into a finished product. Hill involved an injury caused by a silicon-based water repellent material, which was highly flammable, and which exploded when used contrary to warnings, in an enclosed area. (Hill v. Wilmington Chemical Corporation, supra, 156 N.W.2d 898, 900-901.) The court found that the supplier of a solvent called "Sol B," had no duty to warn consumers of the finished product. (Id. at p. 902.) Similarly, in Shell Oil Co. v. Harrison, supra, 425 So.2d 67, Shell sold a chemical known as DBCP to Kerr-McGee, which reformulated the product and marketed it for various applications including as a lawn fumigant. (Id. at p. 68.) Plaintiffs were injured by vapors that permeated their house when a bottle of the Kerr-McGee product broke and spilled on their garage floor. (Id. at p. 69.) The court concluded that Shell, which had placed warnings on its five-gallon containers, had no duty to warn the ultimate users of the product, when a *1191 third party had formulated, packaged, labeled, and distributed the end product. (Id. at p. 68-70.) These cases do not support ACL's position, because they are similar to Walker, where the manufacturing process significantly altered the component raw material.[6]
ACL also argues that the proposed final draft of the Restatement Third of Torts reinforces its contention that the rule of nonliability is widely accepted. It cites a portion of the final draft which pertains to liability of a raw materials supplier for harm caused by the product into which the material is integrated. (Rest.3d Torts: Products Liability (Proposed Final Draft, supra, § 5, p. 151.) "[A] basic raw material such as sand, gravel, or kerosene cannot be defectively designed.... Accordingly, raw materials sellers are not subject to liability for harm caused by defective design of the end-product." (Id., § 5, com. c, p. 156.) By its terms, this rule is inapplicable to the instant case. It is not just a possible design defect in the manufactured end product that caused the injury, but a defect in the raw asbestos contained in the product. Moreover, asbestos is not a component material that is usually innocuous, such as sand, gravel, nuts or screws. As correctly stated in Jenkins, it is the asbestos itself that produces the harmful dust. The latest draft of the Restatement Third of Torts does not support ACL's argument.
Based on all of the foregoing considerations, we conclude that ACL was an appropriate defendant, and that raw asbestos is a product that may have a design defect when it fails to meet the "`"commonly accepted minimum safety assumptions of its ordinary consumers."'" (Morton v. Owens-Corning Fiberglas Corp., supra, 33 Cal. App.4th 1529, 1535.)
B., C.[*]
.... .... .... .... .... .... .... .

D. Proposition 51 Applies to Actions Accruing After June 4, 1986

(4a) Proposition 51 (Civ. Code, § 1431.2) is applied prospectively to causes of action that accrue on or after its effective date. (Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1218 [246 Cal. Rptr. 629, 753 P.2d 585].) ACL and Owens Corning argue that the trial court erroneously *1192 determined that Arena's action accrued before the statute's effective date. The trial court concluded that the action accrued when Arena suffered cellular damage. Because this event took place before June 4, 1986, the effective date of Proposition 51, the court held that Proposition 51 did not apply to the instant case.
Subsequent to the completion of briefing in the instant case our Supreme Court decided the issue in Buttram v. Owens-Corning Fiberglas Corp., supra, 16 Cal.4th 520. In Buttram, the court held: "[A] cause of action for damages arising from the latent and progressive asbestos-related disease mesothelioma has `accrued'  for purposes of determining whether Proposition 51 can be prospectively applied consistent with the rationale of this court's holding in Evangelatos, supra, 44 Cal.3d 1188  if the plaintiff was diagnosed with the disease for which damages are being sought, or otherwise discovered his illness or injuries, prior to Proposition 51's effective date of June 4, 1986." (Id. at p. 525.) Cases accruing after that date are subject to Proposition 51. We invited the parties to submit briefs discussing the impact of Buttram on this case, and the parties agree that respondent had no clinical symptoms before June 4, 1986. The Supreme Court decision in Buttram requires the trial court in this case to apply Proposition 51.
The Supreme Court in Buttram based its determination on an analysis of the purposes of Proposition 51 and the rule of Evangelatos regarding prospective application of Proposition 51. The court concluded that looking to the date of diagnosis or first discovery of manifest injuries did not work a retroactive application of Proposition 51. Because a plaintiff has no awareness of the existence of a latent disease prior to diagnosis or discovery, the court reasoned that there are no noneconomic damages until that awareness of pain and suffering arises. Therefore, no expectation or reliance on prior law is involved when a discovery standard of accrual is used for purposes of Proposition 51.[8]
Although respondent was referred to a pulmonary specialist in 1986 or 1987, and there had been some evidence of changes in his chest X-ray in 1978, he was not diagnosed with any asbestos-related disease until his C-T scan and chest X-ray in 1995. Doctors attributed his previous lung problems to fluid in the lungs, secondary to his kidney disease. Consequently, under the Buttram "diagnosed" or "otherwise discovered" standard, respondent's *1193 cause of action did not accrue, for purposes of Proposition 51, until 1995, and Proposition 51 applies to require apportionment of the noneconomic damages awarded by the court.

E. Proposition 51 Applies to Cases Based on Strict Liability

Respondent concedes that Buttram v. Owens-Corning Fiberglas Corp., supra, 16 Cal.4th 520 requires the application of Proposition 51 to cases accruing after June 4, 1986. He argues, however, that Wimberly v. Derby Cycle Corp. (1997) 56 Cal. App.4th 618 [65 Cal. Rptr.2d 532], a strict products liability case, and case from the Second Appellate District involving vicarious liability, require us to conclude that Proposition 51 has no application in a case based on strict liability. Appellants argue that Wimberly is factually inapplicable and that the extension of its holding to asbestos cases would conflict with Safeway Stores, Inc. v. Nest-Kart (1978) 21 Cal.3d 322 [146 Cal. Rptr. 550, 579 P.2d 441], which concerns principles of comparative fault.
We find that in the instant case, Wimberly and Safeway Stores can be reconciled with the policies underlying Proposition 51 by requiring apportionment (when supported by the evidence), of noneconomic damages between separate products which have caused a plaintiff's injuries. While the evidence may show that each product caused a specific percentage of harm, we conclude that defendants who are within the same chain of distribution of a single product remain jointly and severally liable to the plaintiff for the harm caused by that product. This conclusion involves a compromise between the inherently contradictory policies of strict products liability, which protects the plaintiff at the expense of a deep-pockets defendant, and Proposition 51, which protects the defendant from paying more than its share of noneconomic damages.
The relevant portion of Proposition 51 provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (Civ. Code, § 1431.2, subd. (a).) Our Supreme Court has stated that the language of Proposition 51 does not supply "a certain answer for every possible situation...." (Evangelatos v. Superior Court, supra, 44 Cal.3d 1188, 1202; see also Wimberly v. Derby Cycle Corp., supra, 56 Cal. App.4th *1194 618, 626-627, fn. 6.) In such cases, "[t]he judiciary's traditional role of interpreting ambiguous statutory language or "filling in the gaps" of statutory schemes is, of course, as applicable to initiative measures as it is to measures adopted by the Legislature. [Citation.]" (Ibid.) In our endeavor to fill in the gaps in Proposition 51's application to the instant case, we have reviewed cases which explain the theory of strict products liability and its relationship to concepts of comparative negligence, the policy underlying Proposition 51, and the decision in Wimberly, as well as the vicarious liability cases upon which Wimberly relied.
Respondent claims that Proposition 51 can never be applied to allocate fault among defendants in a strict liability action. To the contrary, there is long-standing Supreme Court authority allocating fault between strictly liable and negligent defendants. (Daly v. General Motors Corp. (1978) 20 Cal.3d 725 [144 Cal. Rptr. 380, 575 P.2d 1162]; Safeway Stores, Inc. v. Nest-Kart, supra, 21 Cal.3d 322.) Almost from the inception of the doctrine of comparative negligence, the court has extended it to cases other than those based expressly on negligence. The theory of comparative negligence was first adopted in Li v. Yellow Cab Co. (1975) 13 Cal.3d 804 [119 Cal. Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], where the court allowed a reduction of a plaintiff's recovery by the degree of fault attributed to the plaintiff's actions. Three years later the court held that fault should be apportioned among multiple negligent tortfeasors. (American Motorcycle Assn. v. Superior Court (1978) 20 Cal.3d 578 [146 Cal. Rptr. 182, 578 P.2d 899].)
In the same year as American Motorcycle, the Supreme Court concluded that "... a system of comparative fault should be and it is hereby extended to actions founded on strict products liability." (Daly v. General Motors Corp., supra, 20 Cal.3d 725, 742.) Daly allowed apportionment of fault between a negligent plaintiff and a strictly liable defendant. The court acknowledged that attempting to compare negligence and strict liability was akin to comparing "apples and oranges," but was able to accommodate both concepts. (Id. at p. 734.) The court suggested that the term "comparative negligence" was a misnomer, and that "equitable apportionment or allocation of loss" was a more accurate description of the concept being applied. (Id. at p. 736.) The court reviewed the provisions of a proposed draft of the Uniform Comparative Fault Act, and noted that the term "fault" included negligent acts as well as acts that subject a person to strict tort liability. (Id. at p. 741.) The Daly court found no reason to require others to bear the portion of damages resulting from a plaintiff's own fault. (Id. at p. 739.)
In Safeway Stores, Inc. v. Nest-Kart, supra, 21 Cal.3d 322, the court applied comparative fault principles to a strictly liable defendant and a *1195 negligent defendant. The court determined that principles of comparative negligence "should be utilized as the basis for apportioning liability between two tortfeasors, one whose liability rests upon California's strict product liability doctrine and the other whose liability derives, at least in part, from negligence theory." (Id. at p. 325.) The court explained: "Nothing in the rationale of strict product liability conflicts with a rule which apportions liability between a strictly liable defendant and other responsible tortfeasors." (Id. at p. 330.) Discussing the purported difficulty of assessing a proportion of fault against a strictly liable defendant, the court said: "[J]uries are fully competent to apply comparative fault principles between negligent and strictly liable defendants." (Id. at p. 331.) For example, the court noted that the jury had no trouble apportioning 80 percent of the fault to Safeway, and 20 percent to the manufacturer, even though Safeway's liability was based on negligence and strict liability and the manufacturer's liability was founded solely on strict liability principles. (Id. at pp. 326, 331-332.)[9]Safeway allows apportionment of fault between defendants in a case involving strict liability. It does not, however, answer the question of how fault is apportioned when the result may decrease the plaintiff's recovery, due to no fault on the part of the plaintiff. This issue is the problem that is presented by Proposition 51.
The Supreme Court has determined that one effect of Proposition 51 is that "... the plaintiff alone now assumes the risk that a proportionate contribution cannot be obtained from each person responsible for the injury." (DaFonte v. Up-Right, Inc. (1992) 2 Cal.4th 593, 600 [7 Cal. Rptr.2d 238, 828 P.2d 140].) The DaFonte court applied Proposition 51 to eliminate a third party defendant's liability for noneconomic damages attributable to the actions of an employer, even though the employer had no liability for the plaintiff's injuries beyond the payment of workers' compensation benefits.[10] (Id. at pp. 596, 600.) The court stated that the clear language of Proposition *1196 51 protects a defendant from liability for noneconomic damages that exceed that defendant's proportionate share of fault. Citing a concurring opinion in Evangelatos v. Superior Court, supra, 44 Cal.3d at p. 1242, fn. 4, the court explained that damages must be apportioned among the "`"universe" of tortfeasors' including `nonjoined defendants....'" (2 Cal.4th at p. 603.) DaFonte is important to the instant case because it indicates the Supreme Court's unwillingness to base the application of Proposition 51 on either the status of the defendant or the theory of the defendant's liability.[11] Moreover, DaFonte demonstrates that the application of Proposition 51 may leave a plaintiff unable to collect the entire award of noneconomic damages.
The foregoing cases confirm that neither principles of comparative fault nor the policy underlying Proposition 51 requires it to be interpreted to exclude its application in the strict liability context. Here, respondent's argument relies on the fact that Wimberly found Proposition 51 inapplicable in a products liability case, but Wimberly concerns a different fact situation than is present in the instant case. Wimberly is not an asbestos case and it does not involve multiple defective products. (Wimberly v. Derby Cycle Corp., supra, 56 Cal. App.4th 618, 623-624, 632.) (5) Wimberly held that Proposition 51 did not apply in a products liability case where "... plaintiff's injuries were caused solely by a defective product and the only parties among whom `fault' can be apportioned under Proposition 51 are in its chain of distribution." (Id. at p. 632.) The Wimberly court found that Proposition 51 does not allow one party within the defective product's chain of distribution to reduce its noneconomic damages in proportion to its share of fault. Rather, strict products liability is based on a policy of allowing a consumer to recover from any entity in the chain of production and marketing of a defective product. All such entities are liable for an injury caused by the defective product as a matter of policy, rather than as a result of any conduct of the entity. (Id. at p. 628.)
Wimberly relied in part on a line of cases from the Second District which found that Proposition 51 does not apply in cases based on vicarious liability. (Miller v. Stouffer (1992) 9 Cal. App.4th 70 [11 Cal. Rptr.2d 454]; *1197 Rashtian v. BRAC-BH, Inc. (1992) 9 Cal. App.4th 1847 [12 Cal. Rptr.2d 411]; Srithong v. Total Investment Co. (1994) 23 Cal. App.4th 721 [28 Cal. Rptr.2d 672].) These three cases were discussed in Wimberly, and need not be extensively analyzed here. It is sufficient to note that a parallel exists between defendants in a product's chain of distribution and defendants in a vicarious liability case. Much like the defendants within the chain of distribution of a defective product, vicariously liable defendants are viewed, for policy reasons, as a single entity.[12] In both situations, the policy of allocating losses to defendants for harm caused by the defendants' joint enterprise justifies dispensing with the requirement that plaintiffs prove the degree of fault of each individual defendant. Wimberly correctly determined that Proposition 51 should not be applied in a manner that would abolish the concept of vicarious liability. Wimberly also refused to apply Proposition 51 to require a plaintiff in a strict products liability case to prove the percentage of negligence of various defendants within the chain of distribution of a defective product.
(4b) Respondent, however, reads Wimberly to bar any application of Proposition 51 in strict liability cases. To accept respondent's interpretation of Wimberly would require this court to extend it beyond its logical foundation and ignore Safeway Stores and DaFonte. However, we can apply Wimberly to the facts of the instant case in a manner that is consistent with Safeway Stores and DaFonte. Wimberly indicated that Proposition 51 would apply where one defendant is strictly liable for injuries caused by a defective product, and another defendant is liable for separate injuries caused by independent negligence. (Wimberly v. Derby Cycle Corp., supra, 56 Cal. App.4th 618, 633, fn. 9.) In this situation, "... parties in the product's chain of distribution would be treated as a single unit for purposes of determining and allocating fault under Proposition 51." (Ibid.) Pursuant to this reasoning, we focus on the instrumentality causing the harm rather than solely on the status of the defendant in this case.
When read together, Wimberly and Safeway Stores can produce an accommodation between Proposition 51, thereby protecting the deep-pockets defendant, and the principles of strict liability, by retaining a lesser burden of proof *1198 for a plaintiff who is injured by a defective product. The different focus of the two policies does not prevent a blending of their principles. Furthermore, apportionment of responsibility for a plaintiff's harm among different defective products, particularly where the evidence shows instances of multiple injuries from several different products, is not precluded. Asbestos products, in particular, are capable of causing varying degrees of injury as a result of the nature of the products themselves and the nature and duration of exposure. Moreover, there are hundreds of different kinds of asbestos products, with "wide variation in form and toxicity" which distinguishes asbestos cases from some other types of products cases. (Rutherford v. Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 972 [67 Cal. Rptr.2d 16, 941 P.2d 1203].) "`Asbestos-containing products do not create similar risks of harm because there are several varieties of asbestos fibers, and they are used in various quantities, even in the same class of product.' [Citation.]" (Ibid.)
Rutherford's discussion regarding the properties of asbestos, the application, in Safeway Stores, of comparative negligence in a case involving strict liability, as well as the discussion in DaFonte, according a broad reading of the term "comparative fault" in Proposition 51, all lead us to the conclusion that Proposition 51 is applicable to the instant case. Adding the rationale of Wimberly to the foregoing considerations suggests an appropriate accommodation of the two policies of limiting a defendant's liability for noneconomic damages to those damages attributable to its own fault, and of holding all defendants responsible for their own defective products.
Therefore, we determine that Proposition 51 is applicable in a strict liability asbestos exposure case where multiple products cause the plaintiff's injuries and the evidence provides a basis to allocate liability for noneconomic damages between the defective products. Where the evidence shows that a particular product is responsible for only a part of plaintiff's injury, Proposition 51 requires apportionment of the responsibility for that part of the injury to that particular product's chain of distribution. Here, if supported by the evidence, it is appropriate to determine the percentage of respondent's injury that is attributable to each asbestos product and allocate that percentage of fault to the entire chain of defendants in that product's distribution system. Defendants who are in the same chain of distribution of a specific defective product remain jointly and severally liable for all harm caused by that product.[13] By this resolution, we give effect to the protective purposes of Proposition 51 for defendants, but retain the strict liability policy of relieving plaintiffs of proving negligence within the defective product's *1199 distribution network. Because the trial court in the instant case failed to consider any application of Proposition 51, we must remand the matter for this purpose in accordance with the opinion expressed herein.
F.-H.[*]
.... .... .... .... .... .... .... .

III

CONCLUSION
Our conclusion that the trial court erred in failing to apply the provisions of Proposition 51 in the instant case, coupled with the failure to make an allocation of noneconomic damages, requires a remand for that calculation.[20] Owens Corning presented the trial court with a proposed allocation of fault percentages, which indicates that Owens Corning thought there was sufficient evidence upon which to make such allocations. The instant case was tried primarily on deposition and videotaped testimony, which could supply a sufficient factual basis for the trial court to make such allocations. We will, therefore, remand the matter to the trial court for such further proceedings as it deems necessary in order to make appropriate allocations pursuant to Proposition 51. In all other respects, the judgment is affirmed. Each party shall bear its own costs on appeal.
Stein, Acting P.J., and Swager, J., concurred.
Appellants' petition for review by the Supreme Court was denied July 29, 1998. Kennard, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions directed to be published are: the first paragraph of the opinion; part I, "Background;" parts II.A, D, and E of the Discussion; and the Conclusion.
[*] See footnote, ante, page 1178.
[1] On February 3, 1998, we granted the application for substitution of Elizabeth Arena as successor in interest to Angelo Arena, deceased. (Code Civ. Proc., § 377.31.)
[2] Apparently all defendants except Owens Corning and ACL settled.
[3] The issue of the inapplicability of the consumer expectations test was, in fact raised by ACL below when it moved for judgment at the close of plaintiff's evidence. Counsel for ACL conceded that asbestos is a "product" for purposes of strict liability, but argued that it was not subject to a design defect analysis. We, therefore, deny respondent's motion to strike the amicus curiae brief as concerning matters outside the theories urged in the trial court.
[4] Amicus curiae also argues that ACL could not be held liable on a failure to warn theory. Because that theory was never raised in this case, we decline to address its applicability.
[5] "Asbestos fiber which is extracted by crushing an asbestos rock and compacting the fiber into bags is a product within the meaning of the Restatement; it is no different than a poisonous mushroom extracted from the ground, which regardless of the changes it undergoes, remains poisonous to the user or consumer. [¶] The fact that an item is processed before it is sold is not determinative of its status as a product, and thus strict liability may be imposed where a person contracts asbestosis while working with raw asbestos fiber, because although asbestos fiber is processed before it is sold to consumers, it is the fiber, rather than the manufactured article, that causes asbestosis." (American Law of Products Liability (3d ed. 1987) § 16:77, p. 97, fns. omitted.)
[6] ACL's reference to Mullen v. Armstrong World Industries, Inc. (1988) 200 Cal. App.3d 250, 257 [246 Cal. Rptr. 32], in which the court stated: "`[A]sbestos is not a "product," but rather a generic name for a family of minerals' [citation]...." does not support its argument. Mullen concerned only the applicability of the "market share" theory to asbestos removal cases, and not the "raw materials" issue.
[8] The Buttram court considered, and rejected the rationale of the insurance cases, which look to the injury-in-fact trigger of insurance coverage and find accrual upon the existence of a subclinical injury. (Buttram v. Owens-Corning Fiberglas Corp., supra, 16 Cal.4th 520, 530-531; Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co. (1996) 45 Cal. App.4th 1 [52 Cal. Rptr.2d 690].) This was the line of cases respondent relied upon primarily in urging that Proposition 51 should not apply in the instant case.
[9] A footnote in the Safeway Stores case has been used to support the argument that different rules should apply in cases of strict liability. The footnote stated that Safeway's liability, being based in part on negligence, "is in no sense solely derivative or vicarious. Accordingly, we have no occasion to determine in this case whether the comparative indemnity doctrine should be applied in a situation in which a party's liability is entirely derivative or vicarious in nature." (21 Cal.3d at p. 332, fn. 5.) However, 10 years after Safeway Stores, in Far West Financial Corp. v. D & S Co. (1988) 46 Cal.3d 796 [251 Cal. Rptr. 202, 760 P.2d 399], the court considered an argument based on the footnote in Safeway Stores. The Far West court concluded, at least in the context of indemnity, that the Safeway footnote cannot be read to support a limitation of the application of comparative fault principles to negligent parties alone.
[10] Unlike an employer, whose immunity is founded on an alternative compensation scheme, a defendant who is truly immune from liability cannot be allocated a percentage of responsibility for damages. (Richards v. Owens-Illinois, Inc. (1997) 14 Cal.4th 985, 989 [60 Cal. Rptr.2d 103, 928 P.2d 1181] [tobacco company, statutorily immune from liability, commits no tort by selling product, and is not subject to Proposition 51].)
[11] In Weidenfeller v. Star & Garter (1991) 1 Cal. App.4th 1 [2 Cal. Rptr.2d 14], the Fourth Appellate District held that principles of comparative fault applied to apportion damages between negligent and intentional tortfeasors pursuant to the provisions of Proposition 51. Responding to the argument that the case did not come within the provisions of Proposition 51 because an intentional tortfeasor's acts are not based on comparative fault, the court noted the absurd result if a negligent tortfeasor would be obligated to pay only its proportionate share of the noneconomic loss if the other tortfeasors were negligent, but would be liable for the entire amount if another tortfeasor acted intentionally. This result of shifting the burden from the more culpable to the less culpable defendant was contrary to the purposes of Proposition 51. The Weidenfeller court did not adhere to a restrictive reading of the term "comparative fault" but placed its emphasis on the policies underlying Proposition 51.
[12] Strict products liability is imposed on retailers, because, "like manufacturers[, they] are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.] In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety." (Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262 [37 Cal. Rptr. 896, 391 P.2d 168].)
[13] As noted in Wimberly v. Derby Cycle Corp., supra, 56 Cal. App.4th 618, 632, footnote 8, defendants within a chain of distribution are free to adjust liability among themselves in an indemnity action.
[20] The allocations made pursuant to Proposition 51 shall include a recalculation of the amounts credited for preverdict settlements pursuant to Espinoza v. Machonga (1992) 9 Cal. App.4th 268, 275-277 [11 Cal. Rptr.2d 498].)