Filed 1/27/16  Hebberd-Kulow Enterprises v Kelomar CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HEBBERD-KULOW ENTERPRISES, INC., | D066505 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. ECU03823) |
| KELOMAR, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Juan Ulloa, Judge.  Affirmed in part as to the jury verdict's award of interest, and the balance is affirmed as modified with directions to prepare an amended final judgment.

Sutherland & Gerber and Lowell F. Sutherland for Defendant and Appellant.

Horton, Knox, Carter & Foote, Orlando B. Foote and Margarita McKee Haugaard for Plaintiff and Respondent.

This appeal comes to us after a retrial pursuant to remand from our prior published opinion, in which this court reversed in part a judgment after jury verdict in favor of plaintiff and respondent Hebberd-Kulow Enterprises, Inc. (HKE).  (*Hebberd-Kulow*

*Enterprises, Inc. v. Kelomar, Inc.* (2013) 218 Cal.App.4th 272 (our prior opinion).) Over many years, defendant and appellant Kelomar, Inc. (Kelomar) placed orders for agricultural supplies with HKE, which provided Kelomar invoices for the goods delivered. During the latter few years of their business relationship, HKE included on its invoices an interest charge for late payments (the interest provision).

In the first trial, the jury awarded HKE a principal sum of damages for the goods it supplied to Kelomar, as well as an interest award, and it also awarded damages to Kelomar on its cross-complaint. We reversed that judgment on the verdict as to the interest award only, after we determined from the record that essential factual issues were not sent to the jury on whether the contracts between HKE and Kelomar included a term representing an enforceable interest provision. (Cal. U. Com. Code, § 2207; all further statutory references are to this code unless noted.) On remand, the trial court took further evidence and the jury returned a verdict determining that HKE was entitled to interest at 1.5 percent per month on the invoices. In a minute order, the clerk recorded the trial court's acceptance of the verdict and filed a notice of entry of judgment.

Subsequently, HKE moved for an award of expenses of proof on matters for which it had requested admissions. (Code Civ. Proc., § 2033.420.) The motion was granted and the court ordered the preparation of an amended judgment. A "final judgment" was prepared and filed, giving the history of the proceedings and setting the net amount of the judgment at $412,023.05, plus postjudgment interest and costs of suit, as well as an award of attorney fees as costs of proof, in the amount of $74,725.25.

Kelomar appeals, contending (1) under a proper interpretation of section 2207, and in light of the parties' prior course of dealings, the evidence was undisputed that they never agreed to include interest charges on late payments as part of their contracts; (2) the court erred or abused its discretion in awarding attorney fees under Code of Civil Procedure section 2033.420, because Kelomar showed that not all of the matters were proved exactly as stated in the requests for admissions (RFA), or that the admissions sought were "of no substantial importance" within the meaning of the statutory scheme; and (3) the final judgment signed by the court changed the terms of the clerk's earlier, ministerial entry of judgment on the verdict, such that it was unauthorized or erroneous. (Code Civ. Proc., §§ 664 [entry of judgment provisions]; 2033.420, subd. (b)(2) [RFA costs criteria].)

Having reviewed the record, we conclude (1) substantial evidence supports the jury's determination of the questions properly sent to it about the intentions of the parties concerning the terms of their agreement, and the underlying substantive judgment on the verdict is affirmed; (2) the record does not show any abuse of discretion in the trial court's award of attorney fees as costs of proof under Code of Civil Procedure § 2033.420; and (3) the trial court must prepare an amended final judgment that reflects the separate awards of principal, interest, and costs to HKE, that properly designates the dates that postjudgment interest began to accrue on the awards of principal and interest, and that sets forth any credits due to Kelomar for amounts it has previously paid toward the net judgment amount (either principal or interest).

FACTUAL AND PROCEDURAL HISTORY

As set forth in our prior opinion, over the course of about 20 years (1987-2007), HKE sold goods to Kelomar. Normally, Kelomar provided HKE with a purchase order number for the requested items and negotiated the price over the telephone. After delivery of the items, HKE would send Kelomar an invoice corresponding to the applicable purchase order number. Since 2003, HKE's invoices have contained on them a printed term: "Unpaid invoices beyond terms will be assessed a monthly service charge of 1-1/2%." Kelomar often paid late, but HKE did not charge Kelomar interest on the late payments.

The dispute between the parties arose after HKE delivered about $250,000 worth of goods in the spring of 2007. These goods were shipped separately with a total of 33 corresponding invoices (the 33 invoices). In 2007, the parties had a falling out over a different set of contractual transactions (HKE's delivery of certain nonconforming labels). Kelomar stopped paying HKE.

## A. First Trial; Appeal

In 2008, HKE sued Kelomar for its failure to pay for the supplies shipped under the 33 invoices. In response, Kelomar filed a cross-complaint alleging damages had arisen from HKE's nonconforming products that were provided under the unrelated contract. Kelomar declined to pay the 33 invoices.

At the first trial, the jury awarded HKE damages in the amount of $439,792.99, consisting of $259,120.50 principal and $180,672.49 interest. The jury also awarded

Kelomar $27,769.94 on its cross-complaint. The net amount of the HKE judgment was $412,023.05, plus postjudgment interest and costs of suit.

Kelomar appealed, contending that the parties never intended any interest payment or service charge to be part of their contract, as shown by their prior course of conduct. Kelomar argued that the issue of whether the interest provision contained in the invoices was a term of the contracts should be governed by section 2207.

In the prior appeal, we agreed with Kelomar's claims that the dispute should be resolved according to the terms of section 2207. We held that the trial court had erred during the first trial, when issuing its order on a particular motion in limine (No. 4), because the trial court prematurely determined as a matter of law that the interest provision was part of the contract. Instead, the record showed that no evidence was yet before the trial court, and the evidence was conflicting on the interest term of the contract, as it later acknowledged.

Accordingly, we reversed the judgment as to the interest portion of the verdict and returned the matter for presentation of evidence. We interpreted the record as showing that counsel had represented that additional evidence was available that would bear upon the issue of whether the parties intended to include the payment of interest as part of their contracts. The record at that time did not support the trial court's decision as a matter of law that the interest provision was a term of the parties' contracts.

## B. Second Trial

On remand, evidence was presented by representatives of each side, concerning their understandings of the transactions in light of their own usual business practices and

those of the farming and agricultural supply communities. The jury heard the individuals' testimony about the events and communications that had occurred over time, leading to the understandings and the disputes between the parties. We summarize that evidence in part I.C, *post*. Copies of the 33 invoices were admitted into evidence.

After being instructed in the language of sections 2202 and 2207 and related sections, the jury returned a verdict that HKE was entitled to obtain 1.5 percent per month in interest on the subject invoices. The verdict did not include any dollar amount. The minute order reflects that the court accepted the verdict and the clerk sent out a notice of entry of judgment. (Code Civ. Proc., § 664.) Further proceedings were held on HKE's motion for costs of proof pursuant to Code of Civil Procedure section 2033.420. (See pt. II, *post*.) Eventually, the trial court rendered a final judgment that recited the verdict had been reached and set forth a net award of damages, $412,023.05, plus postjudgment interest and the costs of proof award, with costs. (Pt. III, *post*.) Kelomar appealed both the judgment and the posttrial order awarding costs of proof.

DISCUSSION

I

*AWARD OF INTEREST*

A. Statutory Scheme and Effect of Prior Opinion

As explained in our prior opinion, it is undisputed that these parties are merchants (§ 2104, subd. (1)) and thus that their transactions are governed by the California Uniform Commercial Code. Section 2202 removes merchants' written agreements for the sale of goods from the operation of Code of Civil Procedure section 1856, the general

6

parol evidence statute. (See 4 Witkin, Summary of Cal. Law (10th ed. 2005) Sales, § 33, p. 46.) Section 2202 is not a statute that provides particular guidance to a court to determine if a writing is intended to be a final expression of the parties' agreement. Instead, it directs the court on what evidence it should admit to explain or supplement the terms of the agreement. (§ 2202; 4 Witkin, Summary of Cal. Law, *supra,* § 33 at p. 46.)

At all the relevant times, there has been no dispute that the parties entered into multiple contracts, or that the invoices correctly listed the agreed upon price of the goods, which were delivered. Rather, the dispute concerns whether the parties agreed to the interest provision on the invoices. In our prior opinion, we determined that "Section 2207 is the proper statute to apply to the invoices and the analysis of whether the parties intended the interest provision to be part of the parties' agreement. Section 2207 provides as follows:

> '(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> '(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> '(a) The offer expressly limits acceptance to the terms of the offer;
>
> '(b) They materially alter it; or
>
> '(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> '(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the

7

writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code.' "

As governing authority, our prior opinion discussed the holdings of *Steiner v. Mobil Oil Corp.* (1977) 20 Cal.3d 90 (*Steiner*). "[S]ection 2207 inquires as to whether the parties intended to complete an agreement: 'Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract.' [Citation.] If the parties intend to contract, but the terms of their offer and acceptance differ, section 2207 authorizes a court to determine which terms are part of the contract, either by reference to the parties' own dealings [citation], or by reference to other provisions of the code." (*Steiner*, *supra*, 20 Cal.3d at pp. 99-100.)

These "supplementary terms" mentioned in section 2207, subdivision (3) may include terms incorporated as a result of the parties' course of dealing. (*Transwestern Pipeline Co. v. Monsanto Co.* (1996) 46 Cal.App.4th 502, 516.) "The terms of an agreement formed pursuant to [section] 2207[, subdivision ](3) are those terms upon which the parties expressly agreed, coupled with the standard 'gap-filler' provisions of Article Two." (*Textile Unlimited, Inc. v. A..BMH and Co., Inc.* (9th Cir. 2001) 240 F.3d 781, 788 (*Textile Unlimited, Inc.*).) Section 1303, subdivisions (a) through (e) define the effect of the parties' previous course of dealing, course of performance, or usage of trade, as they may supply supplemental contractual terms pursuant to section 2207.

In our prior opinion, we noted that at the first trial, "the parties appeared to focus more on waiver of the right to collect interest, not whether the interest provision was

8

actually part of the parties' contracts. The jury was instructed on waiver, the parties submitted evidence regarding waiver, and closing arguments concerned waiver. Simply put, the issue of whether the interest provision was an agreed upon term was not presented to the jury. However, based upon the court's comments that this was a 'significant' disputed fact, it should have been." (See *Kawasho Internat., U.S.A., Inc. v. Lakewood Pipe Service, Inc.* (1983) 152 Cal.App.3d 785, 791 (*Kawasho*).)

At this retrial, directed toward properly applying the alternative standards of section 2207, the trial court allowed the jury to hear conflicting evidence on the issue of whether the parties reached a contractual agreement about interest, and on what terms. These are questions for the fact finder, when conflicting versions of the parties' negotiations require a determination of credibility. (See *Kawasho, supra,* 152 Cal.App.3d at p. 791; *Southern Christian Leadership Conference v. Al Malaikah Auditorium Co.* (1991) 230 Cal.App.3d 207, 220.)

When a trial has been conducted, as here, on the issue of whether an additional term contained in an invoice or business document was part of the parties' contract, as a factual matter depending on the intent of the parties, a substantial evidence review will be conducted on appeal. (*Boyd v. Oscar Fisher Co., Inc.* (1989) 210 Cal.App.3d 368, 378-379; *Kawasho*, *supra*, 152 Cal.App.3d at p. 791; see *Southwest Concrete Products v. Gosh Construction Corp.* (1990) 51 Cal.3d 701, 709 (*Southwest Concrete*), [acknowledging in another context that an additional term (late charges) "became part of the contract" under section 2207].)

9

## B. Framework for Retrial

On remand, the principal award to HKE was not in dispute, nor was the award to Kelomar of $27,769.94 on its cross-complaint. This left a balance of about $231,000 that Kelomar owed as principal to HKE, and it has evidently been paid. On the issue of entitlement to an interest award, the pleadings alleged there were 33 disputed invoices, but the RFAs that HKE served on Kelomar involved only 31 of them. Nevertheless, all 33 invoices were presented to the jury and the parties continued to argue the matter as involving each of them.

It is first important to note which issues were not presented at the retrial. HKE did not claim that the invoices alone amounted to the operative agreements. (See *India Paint & Lacquer Co. v. United Steel Products Corp.* (1954) 123 Cal.App.2d 597, 607 ["The prevailing rule is that an invoice, standing alone, is not a contract, [citations]; and a buyer is ordinarily not bound by statements thereon which are not a part of the original agreement."].) Also, the Kelomar purchase orders and the HKE invoices did not present competing terms which each side was attempting to enforce. (See also *Diamond Fruit Growers, Inc. v. Krack Corp.* (9th Cir. 1986) 794 F.2d 1440, 1443.) The case was not tried as a " 'battle of the forms,' " such as where contracting parties have exchanged pre-printed forms "that attempt to cast liability for certain categories of damage on the other party to the transaction." (*Frank M. Booth, Inc. v. Reynolds Metals Co.* (E.D.Cal. 1991) 754 F.Supp. 1441, 1445; *Transwestern Pipeline Co.*, *supra*, 46 Cal.App.4th at p. 516 ["Common sense tells us the mere exchange of forms containing inconsistent terms, for

however long a period, cannot establish a common understanding between the parties as to which set of conflicting terms is part of their contract."].)

Instead, HKE argued to the jury that the current trial chiefly concerned the way the agricultural business was conducted, and what happened between the parties in 2007 to 2008, when Kelomar stopped paying on the invoices. Kelomar's argument and evidence essentially addressed the course of dealing and performance during the parties' business relationship, to argue that its effect was that the interest language on the invoices, even if known to it, contained an additional term that it would never be enforced. Although this resembles a waiver argument concerning the interest term, the second trial addressed the issues differently, on what terms actually existed in the first place.

### C.  Conflicting Evidence Presented at Retrial

#### 1.  HKE

On the issue of whether the parties had reached an understanding about interest as a portion of their agreement, HKE presented testimony from its president, Michael J. Kulow, about his dealings with Kelomar starting in the 1980s. At that time, both HKE and Kelomar were new companies, and Kulow met with Kelomar's founder, Michael W. Morgan, and they discussed the process for supply by HKE, as a middleman, of agricultural packing materials and other goods to Kelomar. Kulow remembers that he discussed with Kelomar how its payments should be made to HKE in a "timely fashion," but testified they did not anticipate what would happen if they were not. Kulow does not recall any discussion of interest. During cross-examination, Kulow admitted that he left

that early meeting with the feeling that there was an agreement that "things would be the way they were in the trade," but he never told Mr. Morgan about that belief.

At trial, Kulow told the jury about how deals are reached when suppliers sell agricultural packing materials to growers, according to industry customs and practices. Kelomar sent purchase orders or discussed orders with HKE representatives. HKE then ordered the goods from other suppliers for delivery. HKE would then generate an invoice to be sent to the customer, stating the terms.

Generally, as long as a customer kept paying the bills, HKE did not charge interest on overdue invoices. Due to its bad experiences with a few other farmers who did not pay their bills, HKE added an interest term to its invoices starting in 2003. These terms included (1) unpaid invoices for labels or miscellaneous items to accrue interest after 30 days at 1.5 percent; and (2) corrugated materials or related items to accrue interest after 60 days at 1.5 percent.

Kulow understood that charging interest was a norm in the industry for suppliers like HKE. It was a disincentive for late payment of invoices by customers. Other HKE-Kelomar invoices had incentives for timely payment, such as a discount. Some of the 33 invoices also had freight charges added to them.

After HKE added the interest provisions to its invoices, Kulow did not discuss the matter with anyone from Kelomar, and did not receive any complaints from it. He was not asked by anyone at Kelomar what would happen if it did not pay its bill. Generally, HKE valued the ongoing business of its customers, such as Kelomar, and did not charge interest to them for reasons of continued goodwill, and because that was how bills were

12

usually handled in the agricultural industry, which is time sensitive depending on harvest season. As a supplier, HKE understood that farmers were often cash poor at the end of the growing season and that delays in paying bills were not unexpected. A grower has to make initial investments of capital in order to grow the crops, and "[b]y the time you get to harvest, generally, people are a little short of money."

For many years, Kelomar paid HKE the amounts due for goods shipped to it, within 30 to 60 days or by the end of the harvest season. In the spring of 2007, Kelomar first started to dispute paying HKE on the 33 invoices. Kelomar claimed that it incurred damages when HKE supplied nonconforming goods to it, on another separate contract.

After HKE learned that Kelomar would not pay further, it sued for damages for the principal amounts owed on the 33 invoices, as well as interest. HKE had not previously charged Kelomar interest for previous late payments.

HKE called as a witness Kelomar's previous general manager, Matthew McGuire, who worked at Kelomar for 18 years, around 1987 to 2003. He testified at trial that when he oversaw its accounts payable, he determined which bills needed to be paid based on when they were due and what was the status of the company cash flow. He understood that many vendors, such as HKE, had in place both incentive and disincentive payment terms. McGuire thought that the 1.5 percent interest provisions on HKE's invoices "were part of the terms." His opinion was that "many vendors had terms to pay interest, and we knew they could charge interest at any time. So it's better to pay it as soon as we can than to incur the wrath of a vendor." When necessary to retain business relationships, Kelomar paid interest to certain vendors.

13

McGuire stated that while he was at Kelomar, if there were any problems with invoices, he and the seller tried to negotiate and resolve the matters. The presence or absence of the interest provisions in HKE's invoices was not a factor in determining whether Kelomar should pay the principal amount of an invoice.

## 2. *Kelomar*

Kelomar's founder, Michael Morgan, testified about meeting with Kulow in the 1980's when their companies were both new. Morgan told the jury that "the total deal" with HKE since "Day 1," over 20 years, was that "no interest would be charged." He admitted to the jury that the interest provision was always a part of the deal, but he believed "[i]t would not be charged." Thus, he was not concerned when he saw that term on the invoices. Morgan, an executive, did not pay "a lot of attention to what was on the bottom line or the interest component," and did not see any need to protest about it to HKE.

Kelomar's previous office manager, Nancy Osborn, currently worked for it as a consultant on tax and bank issues. In 2007, she was not working for Kelomar. Her understanding on behalf of Kelomar was that when an invoice like HKE's "says on the bottom if it wasn't paid, it could be charged—not that it was. It was, it could be charged." She did not recall having discussed that specific subject with her superiors at Kelomar.

At the conclusion of testimony, the court read jury instructions on sections 1303, 2202, and 2207, giving the jury a framework for applying the evidence and for making a factual finding as to the interest provision. The special verdict decided only that HKE was entitled to obtain 1.5 percent per month in interest on the subject invoices.

14

## D. Analysis

### 1. Section 2207, Subdivisions (1) and (2)

In the previous trial, it was established that the parties had established a contractual relationship that satisfied contract formation requirements, and the amount of principal due to HKE was established. (§ 2207, subd. (1); *Steiner, supra*, 20 Cal.3d 90, 101.) On retrial, the evidence and arguments properly sent to the jury the questions of whether the interest provision had to be specifically accepted by Kelomar, as a condition attached to continuing to do business, and whether Kelomar had made any objections to the inclusion of the interest provision. (§ 2207, subd. (2)(a), (c).) Alternatively, the parties addressed whether collecting interest amounted to a material change in the agreement, in light of the background and underpinnings of the agricultural business practices. (§ 2207, subd. (2)(b).)

We disagree with Kelomar that only questions of law for contract interpretation were again presented at retrial, and that the evidence did not show any significant conflicts. Kelomar focuses on testimony about HKE's previous nonenforcement of the interest provision against Kelomar, until the dispute arose, and claims that is the only contractual issue. However, its argument disregards the other evidence presented to the jury by HKE to the effect that Kelomar was on notice not only of those terms on which the writings of the parties agree, but also certain "supplementary terms incorporated under any other provisions of this code." (§ 2207, subd. (3); *Textile Unlimited, Inc., supra,* 240 F.3d at pp. 787-789.)

15

HKE was able to establish that Kelomar did not raise objections to the interest provision, and that this was a standard provision in the industry that was not unexpected between merchants. (§ 2207, subd. (2)(a), (b), (c); see *Therma-Coustics Manufacturing, Inc. v. Borden, Inc.* (1985) 167 Cal.App.3d 282, 297 [adding standardized term to invoice not a material alteration of contract].) When denying Kelomar's motion for nonsuit, the trial court referred to the evidence thus far as showing that the reasonable expectations of the parties were that a buyer would make payments by the end of the season, before the next season started, and that the refusal to pay any amount should then trigger the timeliness provisions in the outstanding invoices. We next examine Kelomar's evidence on the alternative contractual analysis of section 2207, subdivision (3), regarding supplementary contract terms.

*2. Section 2207, Subdivision (3)*

The jury was given the option of deciding whether a contract arose from the course of dealing between the parties, as described by the witnesses. (§ 2207, subd. (3).) Under section 2207, subdivision (3), "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code." The jury was instructed pursuant to section 1303, subdivisions (a), (b), and (d) that any such supplementary terms could be derived from the parties' previous courses of dealing, courses of performance, or usage of trade. (*Steiner*, *supra*, 20 Cal.3d at pp. 99-100; see *Step-Saver Data Systems, Inc. v. Wyse Technology* (3d Cir. 1991) 939 F.2d 91, 98-99, fns. omitted.) The jury was also

16

given the usual instructions on how to evaluate witness credibility, regarding accounts of the business-related events. (*Textile Unlimited, Inc., supra*, 240 F.3d at pp. 787-789.)

"[S]ection 2207 looks to the actual dealings of the parties and gives legal effect to that conduct. . . . Section 2207 instructs us not to refuse to enforce contracts until we look below the surface of the parties' disagreement as to contract terms and determine whether the parties undertook to close their deal. Section 2207 requires courts to put aside the formal and academic stereotypes of traditional doctrine of offer and acceptance and to analyze instead what really happens." (*Steiner*, *supra*, 20 Cal.3d at p. 100; italics omitted.)

In the closing arguments, both parties discussed the course of performance and course of dealing between the parties, but they interpreted the evidence differently. HKE argued that the interest provisions became part of the deal and applied to the relationship between the parties, because a party is allowed to "change deal terms and have them stick as long as the circumstances that surround that change are consistent with what the law permits." (See § 1303, subds. (a), (d) [evidence on course of performance may show acceptance of performance in a transaction]; § 1303, subds. (b), (d) [evidence on course of dealing in previous transactions may show common basis of parties' understandings].)

HKE's counsel then argued that "something happened that suggested to Mr. Morgan and Kelomar that he shouldn't have to pay. Well, as it turned out, he did have to pay. He still did not pay until he was forced to. So what was the significance of that event, the refusal to pay and the interest provision that we're talking about here?" HKE contended there was a change in circumstances that changed the nature of the dealings

17

between the parties and changed the deal, to allow interest to be charged, because Kelomar had taken action that justified enforcement of the existing interest term. Once Kelomar decided not to pay the 33 invoices, HKE believed it was justified in deciding not to cut Kelomar any more slack on the interest provision, in reliance on the underpinnings of industry custom, which is time sensitive depending on harvest season. A supplier may allow late payments based on a grower's impaired cash flow, as long as an ongoing relationship between the parties supported a decision to forego collection of interest. (See § 1303, subds. (c), (d) [evidence on usage of trade may show reasonable expectations of parties].) HKE had incurred costs in collecting an appropriate obligation that was due, and it argued that interest was properly part of their expenses.

HKE provided testimony that in 2003, based on issues it had with other customers, it adopted an industry practice to add interest to invoices, to serve as a disincentive for late payment of invoices. It did not charge interest to Kelomar as long as there was hope of payment. McGuire, who formerly worked for Kelomar, testified his understanding was that the 1.5 percent interest provisions on HKE's invoices "were part of the terms." Kelomar sometimes paid interest to other vendors. On behalf of Kelomar, Morgan conceded that interest was always a part of the deal, and the jury did not have to believe his testimony that there was an accompanying agreement that it would never be charged, even under circumstances when the business relationship between the parties had fallen apart and a final accounting was required.

Kelomar argued that HKE did not protect its rights by notifying Kelomar that interest was now a part of the agreement, and Kelomar interpreted the parties' course of

18

dealing as only supporting a conclusion that they never agreed to an enforceable interest charge, even if a buyer decided not to pay amounts due. Kelomar argued it was not required to object to the interest provision and it never agreed to modify the underlying contracts. However, Kelomar's theory did not account for the change in circumstances when it stopped payment on the 33 invoices. HKE showed it was entitled to collect appropriate obligations that were due, it incurred costs in doing so, and there was no surprise to Kelomar that the written interest term appearing on the invoices was properly enforceable under these circumstances.

In this substantial evidence review, we are satisfied that the jury verdict awarding interest pursuant to the 33 invoices, on the basis of supplemental contractual terms known to and agreed to by the parties, is well supported by the testimony summarized above, which showed the general course of dealing in the industry and the specific transactions between these parties occurring within that framework. (§ 2207; *Boyd v. Oscar Fisher Co., Inc.*, *supra*, 210 Cal.App.3d at pp. 378-379; *Kawasho*, *supra*, 152 Cal.App.3d at p. 791.) After the interest provision was added to the invoices and made known to Kelomar, the parties continued to close their deals over time, and section 2207, subdivision (3) required the jury to take into account what really happened between the parties. (*Steiner*, *supra*, 20 Cal.3d at p. 100.) This included consideration of Kelomar's refusal to pay and HKE's reasonable expectations that this changed the nature of their contractual arrangements and made a known term, previously held in abeyance, become enforceable.

19

From the very general language of the verdict, we can properly infer that the jury found either or both of the approaches authorized by section 2207 supported HKE's position. Kelomar has no basis to contend that all the evidence was in agreement, such that the trial court should again have interpreted the plain language of the invoices to decide all the contractual issues as a matter of law. It has raised no meritorious objections to the evidentiary support for the jury's award of interest.

## II

### *RFA COSTS AWARD*

Kelomar next contends the court erred or abused its discretion in awarding attorney fees as costs under Code of Civil Procedure section 2033.420, because not all of the items in the RFAs were proven as specified there (e.g., different dollar amounts), or else the admissions HKE sought were "of no substantial importance." (Code Civ. Proc., § 2033.420, subd. (b)(2).) We review these claims under an abuse of discretion standard. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1275-1276 (*Laabs*).)

### A. RFA Purposes

"The primary purpose of [such] requests for admissions is to set at rest triable issues so that they will not have to be tried; they are aimed at expediting trial." (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 (*Brooks*).) If a party fails to admit the truth of any matter stated in a request and if the party requesting that admission thereafter proves the truth of that matter, the party requesting the admission may move the superior court for an order requiring the party to whom the request was

20

directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney fees. (Code Civ. Proc., § 2033.420, subd. (a).) The superior court must make such an order unless it finds (1) an objection to the request was sustained or a response to it was waived under Code of Civil Procedure section 2033.290, (2) the admission sought was of no substantial importance, (3) the party failing to make the admission had reasonable grounds to believe that that party would prevail on the matter, or (4) there was other good reason for the failure to admit. (Code Civ. Proc., § 2033.420, subd. (b).) "An issue is of 'substantial importance' if it has 'at least some direct relationship to one of the central issues in the case, i.e., an issue which, if not proven, would have altered the results in the case.' " (*Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 634 (*Wimberly*).)

A party who denies a request for admission has the burden of demonstrating that the denial was justified under one of the four exceptions listed in Code of Civil Procedure section 2033.420. (*Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 735 (*Garcia*) [burden of justifying denial of requests for admission impliedly placed on responding party].) In determining whether a denial was justified, a superior court may consider whether " 'at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial.' " (*Laabs*, *supra*, 163 Cal.App.4th at p. 1276; *Brooks*, *supra*, 179 Cal.App.3d at p. 511.) "[I]t is [not] enough for the party making the denial to 'hotly contest' the issue. . . . [T]here must be some reasonable basis for contesting the issue in question before sanctions can be avoided." (*Ibid*.)

21

B. RFAs and Responses; Order and Analysis

As previously noted, the pleadings alleged there were 33 disputed invoices, but the RFAs that HKE served on Kelomar before the first trial involved only 31 of them. Nevertheless, all 33 invoices were presented to the jury, the parties continued to argue the matter as involving all of them, and the parties have not identified any material disputed issues about the number of invoices involved, as relating to the RFAs. On appeal, Kelomar seeks to show that the statutory criteria for the costs of proof award were not satisfied because the court misinterpreted the effect of the RFAs and denials.

The subject matter of the RFAs was involved in the first trial, in which both entitlement to the principal amount of damages and to an interest award were litigated. At the second trial, the issues were confined to the entitlement to interest. HKE then brought a posttrial motion for an order of expenses of proof of matters for which it had requested admissions. (Code Civ. Proc., § 2033.420.)

As discussed at the hearing on the motion, the following general topics were covered by the disputed RFAs, all of which Kelomar had denied. Numbers 2 and 3 sought admissions that payments were due within 30 to 60 days as stated on the invoices, after delivery. Kelomar also objected to the "subparts" in those RFAs. It was established at the second trial that interest began to run when the payments were past due. At the hearing, Kelomar argued that it was unclear when any refusal to pay occurred, to trigger any right to start the accrual of interest, which had been disputed. On appeal, it complains the RFAs did not specify between delivery of the goods or delivery of the invoices.

22

Number 4 requested an admission that $253,778.95 in principal was due on the 31 invoices. As noted above, the jury awarded a slightly greater sum to HKE, but the offset from the damages award on Kelomar's cross-complaint was applied, and Kelomar eventually paid HKE about $231,000 in principal. Kelomar argued to the trial court and on appeal that it should not have had to admit to a principal sum that was later adjusted, such as by the cross-complaint award.

Numbers 5 and 6 pertained specifically to the interest issues, requesting admissions that the sum of $5,313.22 interest was due starting August 9, 2007, on the 31 invoices, apparently because that is when Kelomar denied liability for payment of the principal sums. The RFAs also asked Kelomar to admit that additional prejudgment interest had been accruing since that time. Kelomar argued to the trial court that it was never proven why such a date was significant.

Numbers 10 and 11 requested admissions that Kelomar did not pay the principal, although HKE had performed on all 31 invoices. Kelomar complains that this was no longer at issue at the second trial, or alternatively, the cross-complaint recovery was not sufficiently taken into account. Likewise, as to number 12, the RFA asked Kelomar to admit that HKE had demanded payment of the principal amounts, also not an issue at the second trial. At the hearing, Kelomar objected that the offset from the cross-complaint should have been taken into account, such that the principal amount in the RFA was properly disputed.

In number 13, an admission was requested that Kelomar had refused to pay on the 31 invoices. Numbers 14 and 15 asked Kelomar to admit that it was liable for the same

23

sum of $253,778.95 in principal, as well as expenses of proof, pursuant to section 2710 (consequential damages). At the hearing, HKE's counsel pointed out that there was proof at the first trial that the goods contemplated in the invoices were delivered, so an award of costs of proof was appropriate. Kelomar continued to argue that the dollar amount set forth in the RFAs did not exactly correspond to HKE's ultimate recovery. It also pointed out that the consequential damages were not sought pursuant to section 2710, so the RFA was inappropriate. HKE conceded that consequential damages were not proved, but argued that any effect that would have on the overall calculation of the costs of proof would be de minimis.

At the hearing, the court discussed each RFA individually and determined that the unequivocal, unqualified denials by Kelomar were unreasonable, to the degree that it was asserting a position not supported by fact or law, as had been ultimately determined by the jury verdicts. The court then ruled that the issues in the RFAs were important to the case and costs should be awarded on each of the contested ones, except for three that were not of substantial importance (RFAs nos. 12, 14, 15.) (Code Civ. Proc., § 2033.420, subd. (b)(2).) The court next considered whether it could apportion fees among the items granted and denied, and determined that it could not do so because of the interrelationship of all the issues. The dollar amount of fees incurred per RFA was deemed to be insignificant in that light.

The court accordingly granted the motion for an award of the full amount requested, $74,725.25. In the order, the court requested the preparation of an amended judgment, as will be discussed in part III, *post*.

## C. Analysis

We first observe that the briefs on both sides are unhelpful in distinguishing between issues that were common to both trials, for which costs of proof were sought. Kelomar apparently seeks to relitigate the motion de novo and pays no attention to the appellate standard of abuse of discretion (except minimally in the reply brief). In any event, this was a postjudgment proceeding and the statute allowed HKE to seek costs of proof incurred for each of the trials. The trial court could reasonably conclude that the costs of proof incurred at the first trial, when the principal amount of damages was established, were recoverable. At the second trial, only a few of the RFAs pertained specifically to the interest issues, but the issues remained interrelated.

On appeal, Kelomar points not only to its earlier denials of the RFAs, but also argues that only issues before the jury in the second trial should have been compensable as costs of proof. It claims the trial court did not adequately account for the previous award on the Kelomar cross-complaint (on a different contract), when determining whether it was important for Kelomar to admit to owing a principal amount on the 33 invoices. (Code Civ. Proc., § 431.70 [cross-demands for money can be set off regardless of limitations problems].) HKE responds that it was too late for Kelomar to argue the Code of Civil Procedure section 431.70 rule (offsets for breaches of different obligations), which was not raised in 2008 when the RFAs were served. HKE also claims that Code of Civil Procedure section does not apply in the Uniform Commercial Code context, where section 2717 governs offsets on breaches of only the same contracts.

25

Having examined the issues covered by the RFAs, we agree with the trial court that Kelomar's cross-complaint was no longer an issue requiring any offset calculation, since that recovery was already applied to reduce the principal sum due on the 33 invoices. We also agree that the difference between HKE's ultimate recovery (approximately $259,000 before offset) and the amount set forth in the RFAs (approximately $253,000) was inconsequential, for purposes of statutory costs of proof. Under the statute, Kelomar had the burden of showing that its denials were justified under one of the four exceptions listed in Code of Civil Procedure section 2033.420, subdivision (b), but it could not show that the subjects of the RFAs were not substantially important for resolving the case. (*Garcia*, *supra*, 28 Cal.App.4th at pp. 735-736.) It did not show good reason for its failure to admit, except possibly as to the interest RFAs. (Code Civ. Proc., § 2033.420, subd. (b).) The dispute about the principal amount due on the 33 invoices was essential to the determination of the interest issues, having " 'at least some direct relationship to one of the central issues in the case.' " (*Wimberly, supra*, 56 Cal.App.4th 618, 634.) Nor did the unavailability of incidental or consequential damages under section 2710 (RFA no. 15, as conceded by HKE) make any significant difference to the costs of proof issues.

The record shows no reasonable ground for Kelomar to issue its blanket denials of liability, when it admitted that it had received $250,000 worth of goods as listed in the 33 invoices. The court had the discretion to conclude that Kelomar did not hold any good faith belief that it would prevail on the central issues at trial. (*Laabs*, *supra*, 163 Cal.App.4th at p. 1276; *Brooks*, *supra*, 179 Cal.App.3d at p. 511; *Wimberly, supra*, 56 Cal.App.4th 618, 634.)

26

With respect to the trial court's determination that apportionment of fees among the various RFAs was not possible, we apply the basic standard that allocation of fees is a matter within the court's discretion, and is not required when the issues are " 'so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not.' " (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 555 [allocation as between fees authorized for some causes of action but not others].) Further, allocation between fees awardable to jointly represented parties " 'is not required when the liability of the parties is "so factually interrelated that it would have been impossible to separate the activities . . . into compensable and noncompensable time units." ' " (*Brown Bark III, L.P. v. Haver* (2013) 219 Cal.App.4th 809, 830.)

In this case, the court's findings set forth a reasonable basis for determining that apportionment of fees was not possible, that the subjects of all the RFAs were interrelated as to the principal and interest entitlement, each of them was of substantial importance in advancing the resolution of the case, and no good reason was shown for the failures to admit. (Code Civ. Proc., § 2033.420, subd. (b).) It is not our role to reweigh the evidence or relitigate the dispute. We conclude the superior court did not abuse its discretion in awarding attorney fees as costs.

III

*"FINAL JUDGMENT" ISSUES*

Kelomar argues the court had no jurisdiction to enter the "final judgment" dated October 15, 2014, and claims that it somehow changed the terms of its earlier judgment

27

in an unauthorized way.  In response, HKE argues nothing erroneous or prejudicial to Kelomar's interests occurred when the final judgment incorporated the Code of Civil Procedure section 2033.420 costs award into the judgment, even if the manner of entry was somewhat unorthodox.

### A.  Sequence of Events; State of the Record

We again point out that the briefs on both sides are most unhelpful in setting forth all of the relevant procedural background concerning the development of the final judgment in this case.  The record and the face of the final judgment raise issues about a related restitution order made by the court February 14, 2014, requiring that HKE reimburse Kelomar the amount of interest that was awarded to it by the first jury, $195,026.88, pending final resolution at retrial (up from the original $180,672.49, when postjudgment interest was added).  In June 2014, Kelomar was still arguing to the trial court that a portion of the judgment that it had paid should be refunded to it, since the previous interest award had been vacated.  The parties disputed whether it had to be paid before the retrial could proceed, and the court decided at the outset of trial that it was a separate issue that could remain in abeyance.  The record also shows that the previous net judgment amount, including the original interest award, was $412,023.05, with postjudgment interest thereon at 10 percent from the date of the first verdict, June 20, 2011.

After this retrial, the jury rendered its verdict on June 26, 2014, simply awarding HKE 1.5 percent interest per month on the subject invoices.  The minute order of that date further provides that the court accepted the verdict and ordered the clerk to record it

28

as rendered in favor of HKE, and that, "The clerk shall do the judgment as to this trial. Plaintiff's counsel shall prepare an integrated judgment as to both trials." The next day, June 27, 2014, the clerk filed and signed a document entitled "Judgment on Verdict," although the judge did not sign it. Next, the clerk issued a notice of entry of judgment and mailed it to the parties.

The August 5, 2014 minute order for the proceedings on the costs of proof motion granted the amounts requested in full, since the court could not readily allocate the attorney fees among the various RFAs for which costs were granted and denied. The order further stated, "Plaintiff's counsel shall prepare the proposed amended judgment." On August 8, 2014, the court signed an order granting the motion to award $75,725.25 costs of proof, also directing counsel to submit an amended judgment. Other costs were added to the judgment, by interlineations, in the amount of $1,505.

On August 15, 2014, counsel for HKE served a notice of entry of order granting the postjudgment motion for costs of proof, and Kelomar filed its first notice of appeal.

In September 2014, HKE's attorney submitted to Kelomar's attorney a proposed stipulated amended judgment, but no stipulation was reached. Subsequently, HKE applied ex parte for an order directing the clerk to enter costs on the clerk's entry of judgment form, but Kelomar opposed the motion. The court continued the matter until October 9, 2014, after discussing the need for an entry of a single integrated judgment with the parties, and receiving opposition and reply papers.

On October 15, 2014, the court signed the "final judgment" which set forth the awards rendered in the first trial and documented that the reversal of the award of

29

prejudgment interest had necessitated a retrial. The judgment states that the second jury awarded prejudgment interest to HKE and that the court granted the costs of proof motion ($74,725.25). The final judgment awards a net amount of damages of $412,023.05 (the same as the first verdict), plus interest at the postjudgment rate from July 5, 2011 (the first judgment date, not the first verdict date) and an award of prevailing party costs to HKE (less the costs on appeal awarded to Kelomar in the previous appeal, for an aggregate costs award to HKE of $68,707.46).

Subsequently, Kelomar filed its amended notice of appeal, including the postjudgment order as well as the judgment after jury trial.

We note that this final judgment does not on its face reflect whether any portion of the damages awarded in the first trial has already been paid by Kelomar. The restitution order (concerning the interest award) was held in abeyance. We consider the propriety of the final judgment on its face and in light of the record, since HKE admitted to the jury that the balance of the $259,120.05 principal owed by Kelomar to it (less Kelomar's recovery on its cross-complaint) had been paid to it after the first trial (approximately $231,000).

## B. Authority and Analysis

Judgment in a jury trial must be entered by the clerk within 24 hours after the rendition of the verdict, unless the matter is reserved for further consideration or stayed. (Code Civ. Proc., § 664.) Following the rendering of the verdict, the court clerk attempted to comply with the requirements of Code of Civil Procedure section 664, which further provides, "In no case is a judgment effectual for any purpose until entered."

30

In this case, the trial court attempted to delegate to the clerk the preparation of the judgment, as well as the entry of judgment, by merely making an order that accepted the verdict. Later, the court conducted the costs proceedings and included in its order that the prevailing party was required to prepare an amended judgment. Until the final judgment was signed, there was no existing court-issued judgment, only a minute order.

It is a judicial function to render judgment, while entry of the judgment is a ministerial act to be performed by the clerk. (*Casa De Valley View Owner's Association v. Stevenson* (1985) 167 Cal.App.3d 1182, 1193; 7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 44, p. 581; § 55, pp. 590-591.) There shall be only one final judgment in an action. (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222 (*Torres*).) It is well settled that where a " 'judgment is modified merely to add costs, attorney fees and interest, the original judgment is not substantially changed and the time to appeal it is therefore not affected.' " (*Ibid.*)

Thus, a separately appealable postjudgment order effectively enforces the judgment, but does not change its terms with regard to the substantive resolution of the issues of law and fact that were presented to the trial court. (*Torres, supra*, 154 Cal.App.4th at p. 222; see *Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 743-744 [amendment issue regarding the timeliness of an appeal is whether a change in the judgment was clerical in nature, or was a "material and substantial" change involving an exercise of the judicial function]; *CC-California Plaza Associates v. Paller & Goldstein* (1996) 51 Cal.App.4th 1042, 1049 ["we cannot imagine

31

a more substantial or material change in the form of the judgment than in the identity of the losing party"].)

Here, Kelomar has challenged both the underlying judgment and the postjudgment costs/attorney fee order, by properly amending its previous notice of appeal. (*Torres*, *supra*, 154 Cal.App.4th 214, 222.) HKE has not challenged the timeliness of Kelomar's appeal. Kelomar is attacking the final judgment by arguing that the court lost the power to amend the judgment after the verdict was "entered," or actually, accepted by the court in the clerk's minute order.

However, as far as we can discern from the record, the minute order and clerical notice from the June 26 to 27, 2014 proceedings did not amount to any actual preparation of a judgment document for the court to sign, in the exercise of its judicial function. The costs motion and other postjudgment proceedings were still going on, and would affect the total recovery to be obtained. As of June 2014, a dispute was still going on about whether Kelomar was entitled to be reimbursed (as restitution) for some amount of the judgment it had already paid while the first appeal was pending.

As of August 2014, after the costs motion, the trial court anticipated and ordered that "Plaintiff's counsel shall prepare the proposed amended judgment." (See *Torres, supra*, 154 Cal.App.4th at p. 222 [where judgment was modified merely to add costs, attorney fees and interest, it is not " 'substantially changed and the time to appeal it is therefore not affected' "].) When the costs of proof proceeding took place, there was no signed, entered judgment in place, only an accepted verdict.

Kelomar never brought an attack on the "judgment" after verdict, such as a motion for a new trial, motion to vacate judgment, appeal, or an independent action in equity. (See *Nestlé Ice Cream Co., LLC v. WCAB* (2007) 146 Cal.App.4th 1104, 1109-1110 [amendment of nonfinal judgment by new trial order or order to vacate, in exercise of judicial function or discretion, can amend the judgment and start a new appeal period running]; 7 Witkin, Cal. Procedure, *supra*, Judgment, § 65, p. 600; *Craven v. Crout* (1985) 163 Cal.App.3d 779, 782-783.) The parties were unable to stipulate to an amended judgment.

Because of the postjudgment nature of the motion for an award of costs of proof, the incorporation of that ruling into the final judgment did not amount to any substantial modification of the terms of the verdict to be confirmed by a judgment. (*Torres*, *supra*, 154 Cal.App.4th 214, 222; Code Civ. Proc., § 904.1, subd. (a)(2) [postjudgment attorney fees award is separately appealable].) The later costs order did not contain a completely different legal basis for resolving the substantive issues presented to the jury at trial. It did not impliedly amend or modify the verdict (or the order accepting it) to reflect "a new legal ground" for the outcome. (*Sanchez v. Strickland* (2011) 200 Cal.App.4th 758, 764-767.) "Amended" is a term of art in this context, and Kelomar has no colorable claim that the final judgment somehow substantively changed or "amended" any earlier "judgment," since the clerk never had the power to make a judicial act of entering judgment on the verdict.

The face of the current final judgment appears to adopt the previous net judgment amount ($412,023.25), but that net judgment amount does not set forth a calculation of

the dollar amount of the verdict's interest award, or reflect any credits due to Kelomar. We may assume from the record that the first verdict's calculation of the interest award of $180,672.49 was appropriate. However, we are concerned that the current format of the final judgment, showing a net amount due, may inaccurately fail to reflect that some payment of the principal amount of the judgment was tendered. Although the parties did not address this problem until the reply brief was filed, the record reveals restitution concerning interest was still an issue at the outset of trial, although it may have become moot.

It is also unclear whether the trial court intended to set the date when interest at the postjudgment rate began to run at July 5, 2011 (the first judgment date), when that date would properly apply to that award of principal. In light of the proceedings on remand, the award of interest dispute was not finally resolved until the time of the second verdict and final judgment. We leave those matters and calculations for clarification on remand.

We affirm the final judgment as modified, with directions to the trial court to allow the parties to submit forms of proposed amended final judgments, and then to execute an amended final judgment that separately sets forth and clarifies the extent of the principal and interest amounts remaining payable and subject to execution, as well as clarifying the dates that interest began to run, the imposition of costs of proof and the other costs. The amended final judgment shall include all essential information that will allow the parties to finally resolve all their judgment debtor/creditor issues, if any remain.

DISPOSITION

The final judgment is affirmed as to the jury verdict's award of interest, and is affirmed as modified as to the balance, with directions to the trial court to prepare an amended final judgment that reflects the appropriate calculations of separate and net amounts of principal, interest, and costs that are still owing, in light of any credits properly due to Kelomar for amounts it already paid toward principal or interest. Each party shall bear its own costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


AARON, J.